F6urapo1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    EULOGIO APOLINARIO,

4                  Plaintiff,

5           v.                            14 Civ. 2328 (GHW)

6    LUIS ANGIE DELI GROCERY, INC.
     and LUIS OBDULIO GONZALEZ,
7                                         Trial

                   Defendants.
8    ------------------------------x

9
                                         New York, N.Y.
10                                       June 30, 2015
                                         9:00 a.m.
11
     Before:
12
                 HON. GREGORY H. WOODS
13
                                         District Judge
14

15

16

17            APPEARANCES

18
     MICHAEL FAILLACE & ASSOCIATES, P.C.
19        Attorneys for Plaintiff
     BY:  JOSHUA S. ANDROPHY
20        JOHANNA SANCHEZ

21
     MARK A. HIDALGO
22        Attorney for Defendants

23
     Interpreter:
24
          NICHOLAS LUTTINGER (Spanish)
25

F6urapo1

```
 1                (Case called)

 2                THE CLERK:  Counsel, please state your name for the

 3      record.

 4                MR. ANDROPHY:  Good morning, your Honor.  Joshua

 5      Androphy of Michael Faillace & Associates for plaintiff Eulogio

 6      Apolinario.  I'm joined here at counsel table by Johanna

 7      Sanchez, who is an associate at Michael Faillace & Associates

 8      and will be assisting me in the case, though she will not be

 9      doing any questioning of witnesses.

10                THE COURT:  Good.  Thank you very much.  Good morning.

11      You are joined at counsel table by the plaintiff, Mr.

12      Apolinario?

13                MR. ANDROPHY:  Yes.  The plaintiff is two seats to my

14      left, Mr. Apolinario.

15                THE COURT:  Thank you.  Good morning, Mr. Apolinario.

16                MR. APOLINARIO:  Good morning, your Honor.

17                MR. HIDALGO:  Mark Hidalgo for defendants, your Honor,

18      Luis Angie Deli Grocery dba Luis Angie Deli Grocery, and Luis

19      Obdulio Gonzalez.

20                THE COURT:  Good morning, Mr. Hidalgo.

21                Thank you all for being here promptly.  I note that we

22      are using the services of an interpreter.  Please don't

23      hesitate to let me, your counsel, or the interpreter know if

24      you have any difficulty understanding anything that is

25      happening in these proceedings.
```

1            First, let me say that I have received the proposed

2   joint pretrial order on Friday, June 26th.  Unless there are

3   objections with respect to it, I expect to sign it now so that

4   it will guide our proceedings.  Mr. Androphy?

5            MR. ANDROPHY:  No objection.

6            THE COURT:  Mr. Hidalgo?

7            MR. HIDALGO:  None, your Honor.

8            THE COURT:  I am now executing the joint pretrial

9   order.  It is now in effect.

10            I would like to give each of you the opportunity to

11   make opening statements if you would like to.  I will start

12   with you, Mr. Androphy.

13            MR. ANDROPHY:  Thank you, your Honor.

14            Good morning, your Honor.  May it please the Court.  I

15   represent the plaintiff, Eulogio Apolinario, in this lawsuit

16   against defendants Luis Angie Deli, Inc. and Luis Obdulio

17   Gonzalez.

18            I trust the Court is somewhat familiar with the facts

19   and the legal argument that plaintiff will put forward as those

20   we put forward in our pretrial submissions, so I will not

21   attempt to fully summarize them right now.  The plaintiff will

22   shortly be testifying himself and will be able to testify as to

23   the facts.

24            As set out in plaintiff's pretrial papers and the

25   expected testimony of Mr. Apolinario, Mr. Apolinario was paid a

1    straight weekly wage when he worked the Luis Angie Deli, and

2    the wage did not vary even when his hours varied from week to

3    week and also when his schedule changed so that his hours were

4    increased by 5 hours per week.

5             Throughout his employment with defendants, Mr.

6    Apolinario worked well above 40 hours per week and was not paid

7    overtime at one and a half times his regular rate.  Under both

8    federal and New York law, Mr. Apolinario is entitled to

9    overtime damages.  Under both federal law and New York law

10   since 2011, the damages are calculated by determining the

11   overtime he should have been paid.

12            The overtime rate is for all periods one and a half

13   times the regular rate.  The regular rate of pay is calculated

14   by dividing his weekly salary by 40 hours and not by the total

15   number of hours he worked each week.

16            Under New York law since 2011, the regulation at 12

17   N.Y.C.R.R. section 146 subsection 3.5 states that if any

18   employer failed to pay a covered employee at an hourly rate,

19   the regular rate is calculated by dividing the weekly pay by 40

20   hours, by the lesser of 40 hours or the number of hours worked

21   per week.  In this case Mr. Apolinario worked far more than 40

22   hours per week, and therefore the regular rate is calculated by

23   dividing his pay by 40 hours.

24            There has been some discussion in our pretrial

25   conferences and papers about whether Luis Angie Deli is in fact

1    a restaurant covered by section 146.  We submit that quite

2    clearly is a restaurant.  Under section 146-3.5, a restaurant

3    includes "any eating or drinking place that prepares and offers

4    food or beverage for human consumption either on any of its

5    premises," and it goes on and says, "or counter service to the

6    public."

7          As you will hear from Mr. Apolinario, and also I

8    expect from the defendant, Mr. Gonzalez, if he testifies

9    truthfully, Mr. Apolinario worked in the deli section of Luis

10   Angie Deli.  He prepared sandwiches there.  Another employee

11   prepared grilled foods.  These were served to members of the

12   public or to people who came to the counter to order food.

13   They prepared the food right there.

14         Luis Angie Deli was not merely a bodega that sold

15   grocery and similar things.  It served deli, served grilled

16   foods that were prepared right there and offered for human

17   consumption.  That is under New York law the basis for Mr.

18   Apolinario's regular rate being determined by dividing his pay

19   by 40 hours.

20         Under federal law, under the FLSA, there is

21   substantial case law, which we put in our pretrial papers, that

22   states that there is a rebuttable presumption that for an

23   employee who receives a salary rather than an hourly rate, the

24   salary is intended to cover 40 hours of work and not the actual

25   number of hours that he works.

1          If that presumption is not rebutted by the defendant,

2     the hourly rate is calculated by dividing the salary by the 40

3     hours.  We submit that the defendants will be unable to rebut

4     the presumption, especially in light of the fact that Mr.

5     Apolinario's salary stayed the same when, during his

6     employment, his hours increased by 5 hours per week.

7          In addition to the wage and hour claims and some

8     additional New York statutory claims, Mr. Apolinario also has

9     asserted a retaliation claim.  When Mr. Apolinario first filed

10    this lawsuit, he was still working for the defendants at Luis

11    Angie Deli.  Shortly thereafter, Mr. Gonzalez was harassing

12    him, threatened to falsely report him of a crime to the police,

13    and eventually Mr. Gonzalez fired him.

14         Mr. Apolinario, because he is a skilled deli man, was

15    thankfully able to find another job just one or two weeks

16    afterwards.  But that job pays him far less than what he should

17    have been receiving at Luis Angie Deli.  We maintain that he is

18    entitled to the difference in pay between what he should have

19    been receiving at Luis Angie Deli if he had been paid according

20    to the law and what he is paid in his new job.

21         We submit that the testimony that you will hear from

22    Mr. Apolinario and also from the defendant will establish Mr.

23    Apolinario's claims and will set forth the basis for his

24    recovery.  Thank you, your Honor

25         THE COURT:  Thank you very much.

1          Mr. Hidalgo.

2          MR. HIDALGO:  Your Honor, I would just like to say

3     that my client is still not here yet.  I did instruct him to be

4     here by 9:00 in the morning.  I don't know if he is waiting in

5     the lobby outside.  I can check before I start the opening

6     statements.  But I wanted to see if he was still out there.

7          THE COURT:  I'll ask Mr. Daniels to go check the line.

8     Usually, on a day later in the week such as today, the line is

9     not a problem.  Mr. Daniels can check.  Please proceed with

10    your opening.

11         MR. HIDALGO:  May it please the Court, good morning,

12    your Honor.  Your Honor, my client owns a grocery store

13    business located in the Prospect area of the Bronx.  He has

14    operated this business for over 20 years.  During the course of

15    this time, your Honor, my client has employed about 100 people

16    in the store, typically people from the area.

17         The store is a small grocery store business that

18    operates in the area of the Bronx typically known as, referred

19    to as, the South Bronx in New York City.  The business does

20    operate with a few employees at a time such that typically

21    there are several employees working at any one time at the

22    store.  It is my understanding that the business does operate

23    24 hours a day.

24         Generally, like I said, your Honor, the business has

25    employed people that live in the area.  This particular area of

1   the Bronx, Prospect area of the Bronx, has seen drastic changes

2   over the course of the ownership of the store by my client such

3   that this area has notoriously or historically been known for a

4   high degree of violence, violent crime, such that it has

5   typically exceeded certain areas of New York City for violence.

6          However, my client has invested and did invest in this

7   area over 20 years ago, when typically most people were

8   actually leaving the Bronx and creating the kind of flight that

9   we have seen endemic in the Bronx.  Thankfully, the area has

10  seen or is seeing great degrees of investment and is being

11  transformed much like or to a lesser degree like other areas in

12  New York City, areas of Manhattan, areas of Brooklyn.

13         My client during this time, your Honor, has operated a

14  grocery store, bringing much needed food goods to the area.

15  There weren't at that time many stores that operated.  It

16  provided a vital service to the area.

17         At no time during my client's ownership of the store,

18  which at this point is about 20 years or so, your Honor, has

19  anyone except for the claimant brought any claim for unpaid or

20  underpaid overtime wages or, for that matter, any other claim

21  with respect to labor.

22         My client, while his recordkeeping has not been the

23  best in maintaining records for payroll or other labor

24  standards, has at all times abided by both New York State law

25  and federal law with respect to wages to be paid both at the

1    hourly rate and the overtime rate for any and all of his

2    employees.

3              Plaintiff has made several claims both with respect to

4    the overtime wages and retaliatory actions that my clients have

5    allegedly made against him.  All of these allegations are

6    completely false and without merit.  Again, no one in the store

7    in the course of over 20 years has ever brought such action

8    against my client.

9              The evidence will show that, if anything, it was the

10   claimant in this action that has acted in a manner that has

11   threatened other employees at the store.  Notwithstanding that,

12   my client continued to employ the claimant such that now, in

13   spite of my client's generosity, and generosity.

14             As we stand before the Court today in this action, we

15   will show the Court, your Honor, the evidence will show that my

16   client, even though he did not maintain the best of

17   recordkeeping with respect to labor laws and federal laws for

18   recordkeeping of payroll, the evidence will show that he did

19   pay the claimant the hourly rate at the overtime rate and that

20   at no time did he, as the claimant alleges, threaten him with

21   any kind of retaliatory action.

22             I would note that the employee, even after he made the

23   claim against my client, remained gainfully employed by my

24   client for some time and my client did not take an action

25   firing him when he began the action.  The evidence will show

F6trapo1                    Apolinario – direct

1    that plaintiff's claims are without merit, and we will dispute

2    these claims with the evidence today, your Honor.

3              THE COURT:  Thank you very much.

4              Mr. Androphy, please call your first witness.

5              MR. ANDROPHY:  I call Mr. Apolinario.

6              THE COURT:  Mr. Apolinario, please stay there for a

7    moment.  We are going to rearrange the podium and the area from

8    which you will be testifying.  Mr. Apolinario, you are going to

9    be seated in the first seat of the jury box.  Mr. Androphy, you

10   will be questioning him from the podium, which will be moved

11   right next to the witness stand.

12    EULOGIO APOLINARIO,

13        called as a witness on his own behalf,

14        having been duly sworn, testified as follows:

15             THE CLERK:  Please state your full name for the record

16   and spell your last name slowly.

17             THE WITNESS:  Eulogy, E-U-L-O-G-I-O, Amado, A-M-A-D-O,

18   Apolinario, A-P-O-L-I-N-A-R-I-O.

19             THE COURT:  Mr. Daniels has gone downstairs, Mr.

20   Hidalgo, and went to the line, did not see your client there.

21             MR. HIDALGO:  Thank you, your Honor.

22             THE COURT:  Mr. Androphy, please proceed.

23   DIRECT EXAMINATION

24   BY MR. ANDROPHY:

25   Q.  Mr. Apolinario, did you ever work for Luis Angie Deli?

F6trapo1                        Apolinario - direct

1   A.   Yes.

2   Q.   What is Luis Angie Deli?

3   A.   A grocery store that prepares sandwiches.

4   Q.   Where is Luis Angie Deli located?

5   A.   Prospect and 164th.

6   Q.   Is that in the Bronx?

7   A.   Yes, it's in the Bronx.

8   Q.   Can you describe the physical layout of Luis Angie Deli.

9   A.   It's a decent size grocery store where the food is prepared

10  to sell for the clients, various kinds of meat, cold sandwiches

11  that they also sell to people, to the clientele.  You have the

12  counter, which is on one side, and the other side is the deli.

13  And you have a grill, a microwave, a toaster, and a coffee urn.

14  Q.   Are the sandwiches prepared on-site or somewhere else?

15  A.   The sandwiches are prepared at the place.

16  Q.   Can you describe the types of sandwiches that are served

17  and prepared.

18  A.   Various sorts of sandwiches are prepared, meat which sold

19  with toasted items, fried meat, chops, chicken hindquarters,

20  chicken breasts.

21  Q.   Those are all prepared there at Luis Angie Deli?

22  A.   I prepared them.

23  Q.   When did you begin working at Luis Angie Deli?

24  A.   In 2000.

25  Q.   How did you find your job at Luis Angie Deli?

F6trapo1                          Apolinario – direct

1    A.  It seemed OK to me.

2    Q.  How did you come to find the job, to get the job at Luis

3    Angie Deli?

4    A.  Through Mr. Juan Rafael, who was the first one to employee

5    me there.

6    Q.  Was he the owner at the time that you started work there?

7    A.  Yes, he was the owner.

8    Q.  Did there come a time that the defendant, Luis Obdulio

9    Gonzalez, became the owner of Luis Angie Deli?

10   A.  Yes, nine years ago.

11   Q.  After Mr. Gonzalez bought the deli, who set your hours of

12   work?

13   A.  Luis did.

14   Q.  Who decided how much you would be paid for your job?

15   A.  Luis did.

16   Q.  What did you do in your job at Luis Angie Deli?

17   A.  My responsibility was basically to mind the deli and

18   prepare the sandwiches.  However, the if there was not a lot of

19   activity, my responsibilities included checking the

20   refrigerator, checking the deliveries, and keeping an eye on

21   the clientele.

22   Q.  On a typical day, how much of your time would you spend as

23   the deli man?

24   A.  Most of the time because the deli was very busy.

25   Q.  Was there anyone else who worked in the deli section of

F6trapo1                              Apolinario - direct

1   Luis Angie Deli with you?

2   A.   Yes.

3   Q.   What were the jobs of the other people who worked at the

4   deli?

5   A.   In the morning there were two.  In the afternoon I worked

6   by myself.  I would then continue to do the sandwiches and pass

7   the grill to the other person.

8   Q.   I think you just alluded to this, but what was your main

9   job at the deli?

10  A.   To take the orders and make the sandwiches.

11  Q.   On a typical day, approximately how much sandwiches would

12  you make for customers who came to the Luis Angie Deli?

13  A.   We prepared 40 heros and about 7 to 9 on rolls.

14  Q.   7 to 9 sandwiches on rolls?

15  A.   On rolls apart from or in addition to the heros.

16  Q.   In addition to sandwiches, did Luis Angie Deli prepared

17  other prepared foods?

18  A.   Yes, fried meats, toasties, fried potatoes, bacon and eggs,

19  various sorts of things.

20  Q.   Do you recall approximately the sandwiches cost?

21  A.   The prices varied starting at about $5, and with extras it

22  would cost more.

23  Q.   Were you able to observe how much the bodega and deli made

24  in a typical day from both deli sales and grocery sales?

25  A.   The entire earnings, if you include everything, of the

F6trapo1                    Apolinario - direct

1   grocery store on a daily basis were between 1,000 and 1,500,

2   maybe 2,000.  2,000 during the day and 250.

3   Q.  How did you learn this information about the deli sales?

4   A.  Because I would close the deli together with the person

5   that was working on the cash register.

6   Q.  When you were first hired to work at Luis Angie Deli, did

7   someone tell you what your schedule would be?

8           THE INTERPRETER:  With your Honor's permission.

9   A.  Mr. Juan, when I started with him, I worked from 7:00 until

10  5:00 in the afternoon.

11  Q.  When Mr. Gonzalez took over the deli, did your schedule

12  change?

13  A.  Yes.

14  Q.  What did the schedule change to?

15  A.  From 7:00 in the morning until 11 o'clock at night from

16  Monday through Friday.  On Saturdays I came in from 3:00 to

17  11:00 and on Sundays from 1:00 till 10:00.

18  Q.  Did you have the same schedule the whole time that you

19  worked at Luis Angie Deli?

20  A.  No.  It changed several times.

21  Q.  First, I want to ask you if you can remember what your

22  schedule was in 2008.

23  A.  In 2008 it was from 7:00 to 11:00.

24  Q.  Which days of the week?

25  A.  That was from Monday through Friday from 7:00 to 11:00,

F6trapo1                          Apolinario - direct

1    Saturdays from 3:00 to 11:00, and Sundays from 1:00 to 10:00.

2    Q.  Do you recall how much you were paid at that time?

3    A.  I was being paid 875 in two payments.  On Tuesdays 475 for

4    the morning turn.

5            THE INTERPRETER:  The interpreter corrects himself.

6    A.  85 for the morning term.  And for the afternoon I would

7    receive 390 Saturdays in the afternoon.

8            THE INTERPRETER:  Excuse me, your Honor.  I'm getting

9    some help with the English interpretation from the witness.

10   Q.  Did you receive the same amount of pay each week during

11   this period?

12   A.  During that period, yes.

13   Q.  How were you paid?

14   A.  Cash.

15   Q.  Was there any written record of your pay that you saw?

16   A.  No.

17   Q.  Were you given any statement of the wages you were being

18   paid?

19   A.  No.

20   Q.  When did your schedule change at Luis Angie Deli?

21   A.  Sometime in 2009.

22   Q.  Do you recall approximately what month?

23   A.  Either June or July.

24   Q.  What did your schedule change to at that time?

25   A.  I was working at that time from 7:00 in the morning until

F6trapo1                          Apolinario - direct

1    11:00 in the morning and from 3:00 until 11:00 at night from

2    Mondays through Fridays.  And Saturdays and Sundays it was the

3    same.  I came in at 3:00, and on Sundays from 1:00 until 10:00.

4    Q.  Just so the record is clear, what time did you finish on

5    Saturday?

6    A.  On Saturdays I would finish at 11:00.  But if there were

7    extra clients still waiting, we would work longer.

8    Q.  When you testified that you worked on Monday through Friday

9    7:00 a.m. to 11 a.m. and then 3 p.m. to 11 p.m., was that two

10   shifts within the same day?

11   A.  Yes.

12   Q.  Did your pay change at that time?

13   A.  Yes, the wages changed.

14   Q.  What did they change to?

15   A.  They changed in that I was receiving 325 for the morning

16   turn and 390, so that it came to a total of 715 weekly.

17   Q.  You testified a moment ago that sometimes you would have to

18   work past 11 p.m. on Saturdays?

19   A.  Yes.  If the grocery store was busy, and people stayed,

20   then we would have to remain.

21   Q.  Did you ever have to stay past your scheduled time on other

22   days of the week as well?

23   A.  Yes, according to how business was.

24   Q.  If you had to stay later, would your pay change in any way?

25   A.  No.

F6trapo1                        Apolinario – direct

1   Q.  Would your hours be adjusted on other days of the week?

2   A.  No.

3   Q.  After the change to your schedule around 2009, did your

4   schedule ever change again?

5   A.  Yes.

6   Q.  How did it change?

7   A.  I would enter at 3:00 and I would begin to work at –– I

8   would start earlier, at 2 o'clock in the afternoon.

9   Q.  Was that every day of the week you would start earlier?

10  A.  From Monday to Friday.

11  Q.  Did your schedule change so you left earlier at that time?

12  A.  No.

13  Q.  Did your schedule change in any other ways at that time?

14  A.  It didn't change, no.  After I had begun to work from 2:00

15  to 11:00.

16  Q.  When did this change take place that you would be working

17  from 2:00 to 11:00 instead of from 3:00 to 11:00?

18  A.  In 2013.

19  Q.  Do you recall what month?

20  A.  August, around, or September.  No, September.

21  Q.  Was there any change to your pay at the time that your

22  schedule changed so that you would start working at 2 p.m.

23  rather than at 3 p.m.?

24  A.  No.  They continued paying me the same.

25  Q.  That's the $715 per week you testified about earlier?

F6trapo1                          Apolinario - direct

1   A.   Yes.

2   Q.   After this change to your schedule in 2013, did you have

3   any other changes to your schedule?

4   A.   No.

5   Q.   When you worked at Luis Angie Deli, were you asked to keep

6   track of your hours in any way?

7   A.   No, never.

8   Q.   You never punched in on a computer or time card?

9   A.   No, nothing like that.

10  Q.   Other than in between your morning shift and your afternoon

11  shift, did you receive any breaks during your work time at Luis

12  Angie Deli?

13  A.   No.  The only pause was on Saturday from 11:00 to 3:00 in

14  other words, when I had those two turns, the rest would come in

15  between the two turns.

16  Q.   Right.  When you had the morning shift and the afternoon

17  shift, you would have that break in between, correct?

18  A.   Between the two turns, yes.  Shifts rather.

19  Q.   Other than those shifts, or other than the break between

20  those shifts, did you receive any other break time?

21  A.   No.

22  Q.   Did you always receive your pay at the time you were

23  scheduled to receive it?

24  A.   Sometimes they would give you a portion of your pay, and

25  then you would have to receive the remainder of it later.  That

F6trapo1                         Apolinario - direct

 1   didn't happen all the time, but sometimes.

 2   Q.  Did you ever see a pay stub when you were paid?

 3   A.  No.

 4   Q.  Were you ever required to sign any document in order to get

 5   paid?

 6   A.  No.

 7   Q.  Did you ever receive any document during the time you

 8   worked at Luis Angie Deli stating how much you would be paid?

 9   A.  No.

10   Q.  Did you ever sign any documents to work for Luis Angie

11   Deli?

12   A.  No, never.

13   Q.  Did you continue to work at Luis Angie Deli after filing

14   this lawsuit?

15   A.  Yes.

16   Q.  Did anything happen?  Did Mr. Gonzalez do anything to you

17   after you filed the lawsuit while you were still working at

18   Luis Angie Deli?

19   A.  After I filed the lawsuit, he never left us in peace.  He

20   threatened us with revealing us to immigration.  He said that

21   if we didn't remove the suit, they would report us to

22   immigration, and his brother was going to call and make a case

23   against us with the police that they would have us sent back to

24   Santo Domingo.  He called and spoke to my son and said that if

25   I didn't remove the --

 1              MR. HIDALGO:  Objection.  Hearsay.

 2              THE COURT:  You can continue.  I'm overruling the

 3     objection.  As I understand it, the comment that the witness is

 4     offering is a statement by a party defendant.  Proceed.

 5     A.  He said to my son that if I didn't remove the claim or to

 6     cease in the claim, that he was going to have me expelled to

 7     the Dominican Republic.

 8     Q.  Anything else that he did to you after you filed the

 9     lawsuit?

10              THE COURT:  I'm sorry.  Let me clarify.  Mr.

11     Apolinario, the statement that you just recited regarding the

12     statement by Mr. Apolinario, did you hear that statement from

13     your son?

14              THE INTERPRETER:  May I, your Honor?  I believe the

15     statement came from Mr. Gonzalez, not Mr. Mr. Apolinario. He

16     didn't make the statement.  It was his employer that made the

17     statement.

18              THE COURT:  Thank you.  Let me hear what the witness

19     said.

20              THE WITNESS:  My daughter told it to me.

21              THE COURT:  Thank you.  I'm going to sustain the

22     objection and I'm going to not accept the testimony regarding

23     statements made by the witness's daughter to him.  Thank you.

24     Q.  Was there anything else that Mr. Gonzalez did to you or

25     said to you after you filed the lawsuit?

F6trapo1                          Apolinario - direct

1    A.  Yes.  He said that if I didn't --

2             THE INTERPRETER:  With your Honor's permission.

3    A.  The last time he said to me that if I did not remove the

4    lawsuit against him, he was going to call the police, who would

5    demonstrate a video of me robbing the grocery store.

6    Q.  Had you ever stolen anything from Luis Angie Deli?

7    A.  He knows that that's a lie.  Nobody, not him nor anybody

8    else, can claim that.

9    Q.  When did you stop working at Luis Angie Deli?

10   A.  On the 13th of June 2014.

11   Q.  Why did you stop working at Luis Angie Deli?

12   A.  He fired me.

13   Q.  Did he say anything to you when he fired you about why you

14   were being fired?

15   A.  Because he told me that I would have to withdraw the

16   lawsuit.

17   Q.  When you say he fired you, who were you referring to?

18   A.  I'm referring to Mr. Gonzalez.

19   Q.  After you were fired from Luis Angie Deli, did you look for

20   a new job?

21   A.  Yes.

22   Q.  Did you find a new job?

23   A.  On the following week.  The following two weeks rather.

24   Q.  How much does that new job pay?

25   A.  450 a week.

F6trapo1                    Apolinario – cross

1   Q.  Are you still working at that new job?

2   A.  Yes.

3           MR. ANDROPHY:  I have no further questions.

4           THE COURT:  Thank you very much.  Mr. Hidalgo.

5   CROSS-EXAMINATION

6   BY MR. HIDALGO:

7   Q.  Good morning, Mr. Apolinario.  Mr. Apolinario, you stated

8   that the store is a decent size store.  Could you explain what

9   that means.

10  A.  It's a grocery store that's not very small, and there is

11  enough space for between 40 and 50 people.

12  Q.  How many registers are in the store, Mr. Apolinario?

13  A.  You mean for collecting money?

14  Q.  Yes, correct.

15  A.  There is only one cash register, but sometimes they take

16  money at the counter.

17  Q.  How many counters, Mr. Apolinario?

18  A.  A counter.  It's not very big, but it's --

19          THE INTERPRETER:  Gesturing with his hands.

20  Q.  What is the size of the counter?

21  A.  I would say from here to here.

22          THE COURT:  Indicating approximately three seat widths

23  in the jury box.

24  Q.  Is that the entire area that someone can place goods on

25  that counter, or is it closed off so that certain of the area

F6trapo1                       Apolinario - cross

1    is not available for space for people to put goods on?

2    A.   There is the cash register, and then there is the Lotto

3    machine which is there as well.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. HIDALGO:

2    Q.   How large is the space where people could put goods on the

3    counter, Mr. Apolinario?

4    A.   I couldn't tell you exactly how large that counter space is

5    but I can tell you that it was a space that was sufficiently

6    large to allow you to work on it.

7    Q.   Is it smaller than the space you've just identified earlier

8    that was approximately the length of three seat widths that you

9    just showed in the jury box -- witness box?

10   A.   From the space where the cashier is more or less from here

11   to here.  One side is for -- if the cash register is over here

12   and the lotto machine is over here then there's space more or

13   less this wide for the food.

14   Q.   So the entire area you just showed is the entire area I

15   could place goods on if I'm shopping?

16   A.   Yes, to put your purchases on.  It's a counter.

17   Q.   Very good.  Mr. Apolinario, you said that you grill food.

18   Is there an oven in the store?

19   A.   No.  There's an electric griddle.

20   Q.   And the food that you grill is -- you know I think the

21   witness, you had stated "meats and chicken" or "chicken".  I

22   heard chicken.  Is there anything other than chicken that we

23   grill?  Is there anything other than chicken that's grilled?

24   The witness stated that he grilled chicken.

25   A.   There's a fryer.

1   Q.  I am not asking about the fryer.  Is there anything else

2   that's grilled other than the chicken?

3   A.  Yes.  Steaks, bacon and eggs and grilled cheese sandwiches,

4   all of those things are prepared on the grill.

5   Q.  Is it mostly breakfast that you are preparing on the grill?

6           THE COURT:  Breakfast was the question?

7           MR. HIDALGO:  Yes, correct.

8   A.  Yes, breakfast.

9   Q.  So the majority of the food that is prepared on the grill

10  is breakfast?

11  A.  No.  We often warm up cold sandwiches on the grill because

12  we do a lot of different things on it.

13  Q.  Are you just warming the food then?

14  A.  No, because the hot sandwiches are prepared in the

15  microwave.  Things that are made with chicken, beef, steak,

16  bacon, eggs and cheese are made on the grill.

17  Q.  Is the chicken already precooked?

18  A.  No.  It's prepared in the grocery store.

19  Q.  Are there other meats that are also cooked?

20  A.  Oh, yeah, chicken wings, chops, chicken hinds, muscles and

21  legs --

22          THE INTERPRETER:  Interpreter corrects himself,

23  thighs.

24  A.  And toasties.  We prepare everything for frying in the

25  bodega in the grocery store.

1   Q.  So most of the food is sandwiches then?

2   A.  The thing that moves best in the grocery store are

3   sandwiches.

4   Q.  Do you cook rice at this store?  Was rice ever cooked at

5   the store?

6   A.  During my period of time rice was never cooked.

7   Q.  Potatoes?

8   A.  Fried.

9   Q.  So, no baked potatoes, no mashed potatoes?

10  A.  No.

11  Q.  Mr. Apolinario, you stated that the sandwiches cost or

12  costed approximately five dollars.  You stated that the

13  business, you had knowledge that the business sold or

14  approximately sold 1500 to 2000 a day.

15  A.  And even as much as 2,500.

16  Q.  Did you ever operate the cash register?

17  A.  But I worked along side of the cashier and he would tell me

18  at the end of the day what he had collected.

19  Q.  OK.  Was that yes or no, did you ever operate the cash

20  register?

21  A.  No.

22  Q.  You stated -- you just stated that you never operated the

23  cash register but your earlier testimony you said that you

24  closed out the cash register; was that accurate?

25  A.  No.  I didn't say the cash register.  I said I closed the

1    grocery store, closed the store.  We closed the store together.

2    Q.  So you don't have any knowledge of how much the register

3    would total in a day then?

4    A.  Well, I helped him to close up and we counted the bills and

5    summed up the bills.  I would repeat to him -- I would read off

6    the bills that had been collected at the grocery store.

7    Q.  So you never totaled the cash register, Mr. Apolinario?

8    A.  No.

9    Q.  Thank you.  Mr. Apolinario, you gave testimony regarding

10   hourly worked or work shifts that you worked at the store.  I

11   believe that there was a shift change or your testimony in 2009

12   from the 2008 work schedule.

13   A.  Yes.

14   Q.  That you began working 7 a.m. through 11 a.m. Monday

15   through Friday at some point in 2009.

16   A.  I worked in the morning from seven to 11 and the afternoon

17   and evening from three to 11, Mondays through Fridays.

18   Q.  Why did you start working the shift from seven a.m. to

19   11 a.m.?

20   A.  Because I was tired of working a continuous shift and I

21   asked him if he could give me a shift with a rest period in

22   between.

23   Q.  And from your testimony he complied with your request?

24   A.  Yes.  Yes.  I couldn't go on working continuously.

25   Q.  You didn't change the shift, Mr. Apolinario, because there

1    was a change in personnel and you wanted to cover the shift of

2    another employee?

3    A.  The one that had the afternoon shift when left I began to

4    work continuously.

5    Q.  I'm confused.  Are we talking about '08 or '09?

6    A.  No, 2008.  Mostly when I worked at that bodega the hours

7    were continuous.

8    Q.  Was that the previous employer shift?  Because I heard the

9    name of the previous employer.

10   A.  The previous employer whose name was Juan Fernandez.  Yes,

11   I worked from seven until five in the afternoon from Mondays

12   through Fridays and I came in on Saturdays at three, three to

13   11.  That is with the other owner.

14   Q.  Mr. Apolinario, did you ever set your own hours such that

15   you would tell your employer, I am coming in an hour earlier or

16   I am coming in an hour later?

17   A.  On occasions when I had a medical appointment.

18   Q.  For any other reason?

19   A.  That was the only reason.

20   Q.  Did you ever take any rest during your shifts, the various

21   or your time when you were working at store at any time you

22   were working at the store?

23   A.  No.  The rest periods I took were on the occasions when I

24   took them between the two turns that I was working.

25   Q.  Is there an area in the store where employees can rest?

1    A.  During the period of time when I was there there was

2    nothing like that.  As far as now goes, I don't know.  I have

3    no idea.

4    Q.  Did any other employees ever take a rest to your knowledge

5    when they were working there?

6    A.  No.

7    Q.  Mr. Apolinario, you stated that my clients had threatened

8    you with contacting immigration?

9    A.  Yes.

10   Q.  Were you ever contacted by immigration?

11   A.  No, because he menaced me and thinking that by menacing me,

12   by threatening me I would withdraw the suit.

13          MR. HIDALGO:  Your Honor, can you instruct the witness

14   just to answer my question.

15   A.  He threatened me with calling the child support agency.  In

16   other words, he was threatening my children as well.

17   Q.  Were you ever contacted by child support, yes or no?

18   A.  No.

19   Q.  Has immigration ever contacted you?

20   A.  No.

21          THE INTERPRETER:  Excuse me, counselor.  I don't mean

22   to interrupt at an inappropriate moment.

23          Your Honor, coming up at most appropriate moment I'd

24   like to take a small break.

25          THE COURT:  Yes.

1           THE INTERPRETER:  Thank you.

2           MR. HIDALGO:  Should I step down?

3           THE COURT:  No.  We're not taking a break now.  First

4     comfortable break.

5           MR. HIDALGO:  Okay.  Sorry about that.

6     Q.  Mr. Apolinario, you stated that my client had alleged that

7     you had stolen things or at some point had stolen something.

8     A.  That's what I was asking him to prove when I had stolen

9     anything from him.

10    Q.  Did the police ever contact you regarding anything, a claim

11    that my client filed or anything?

12    A.  No, but he threatened me with it.

13    Q.  The answer is no?

14    A.  No.  The police never got in touch with me.

15    Q.  Thank you.  Has the police or any other government agency

16    ever contacted you regarding any claim?

17    A.  No.

18    Q.  Did you ever file criminal charges against my clients for

19    the alleged harassment that you are claiming?

20    A.  You want to know whether I ever filed charges against him?

21    Q.  Did you ever contact police regarding the alleged

22    statements that you are making or assertions that my client was

23    harassing you for all these various things?

24    A.  No, I didn't go to the police but I did go to the court of

25    protection and they did not give me an order of protection.

1   They told me that something would have to happen first.

2   Q.  So nothing happened.  Is that why they wouldn't give you an

3   order; is that what you're saying?

4   A.  No.

5   Q.  Is it because had you no evidence?

6   A.  No.  It is because they said that nothing had happened.  If

7   something would happen they would give me an order of

8   protection but since he was just threatening they wouldn't give

9   me an order of protection.

10  Q.  So I ask again, is it because you had no evidence that you

11  didn't get the order?

12          MR. ANDROPHY:  Objection.

13          THE COURT:  Sustained.

14          MR. HIDALGO:  I have no further questions, your Honor.

15          THE COURT:  Thank you.

16          Mr. Androphy.

17  REDIRECT EXAMINATION

18  BY MR. ANDROPHY:

19  Q.  Mr. Apolinario, can you clarify for the record how you

20  observed the register totals for Luis Angie Deli?

21  A.  No.  I observed them.  It's that the cashier and I closed

22  up together and sometimes I was handling the bills from things

23  that had been purchased and he would say oh, well, we collected

24  this much or that much.

25  Q.  So in closing out the register with the cashier, what was

1   your role or your job in closing out the register with the

2   cashier?

3   A.  Well, I didn't have any role.  I would see that, you know,

4   we had sold a certain amount of beer, I would tell him that we

5   sold a certain amount.  I really wasn't interested in finding

6   out how much was sold.  I simply knew how much was sold because

7   he mentioned it to me.

8              MR. ANDROPHY:  OK.  I have know further questions.

9              THE COURT:  Thank you.

10             Mr. Hidalgo.

11             MR. HIDALGO:  No questions, your Honor.

12             THE COURT:  Mr. Apolinario, thank you very much for

13   your testimony.  You can step down.

14             Mr. Androphy.

15             MR. ANDROPHY:  The plaintiff rests.

16             THE COURT:  Thank you very much.  I am going to take a

17   short break now.  It is 10:23.  I will take a ten-minute break.

18   At the end of that break, Mr. Hidalgo, it will be your turn to

19   call your witnesses for us to proceed in the case.

20             So I will see you all back here no later than 10:33

21   when I will return to the bench.  You should be here a little

22   bit sooner so that we can start on time.  Thank you.

23             THE INTERPRETER:  Your Honor, I just would beg you a

24   little, an extra five minutes on that so that I can return a

25   couple of calls.  Thank you so much.

1            THE COURT:  Yes, we will take a 15-minute break and I

2     will be back on the bench at 10:28.  The remainder of my

3     comments persist.  Thank you.

4            THE INTERPRETER:  Thank you, your Honor.

5            (Recess)

6            THE COURT:  Thank you.  You can be seated.  Thank you.

7            We're back from our break, Mr. Hidalgo.  Call your

8     next witness.

9            MR. HIDALGO:  Thank you, your Honor.  I call my

10    client, Luis object dual yo Gonzalez of he is already seated.

11           THE COURT:  Thank you.

12           Mr. Gonzalez, please, stand.

13     LUIS OBDULIO GONZALEZ,

14        called as a witness by the Defendants,

15        having been duly sworn, testified as follows:

16    DIRECT EXAMINATION

17    BY MR. HIDALGO:

18    Q.  Good afternoon, Mr. Gonzalez.

19           Mr. Gonzalez?

20           THE INTERPRETER:  Counsel, could you bear with me one

21    moment?

22           Your Honor, this piece of equipment has failed.  I'm

23    going to try these headsets on the other channel.  Sorry for

24    the interruption.

25           (Pause)

```
 1              THE INTERPRETER:  OK, counselor.

 2              THE COURT:  Proceed.

 3              MR. HIDALGO:  Thank you.

 4   Q.  Good afternoon, Mr. Gonzalez.  Mr. Gonzalez, do you own a

 5   grocery store?

 6   A.  Yes, sir.

 7   Q.  Can you tell me where it's located?

 8   A.  On 76 Prospect Avenue in the Bronx.

 9              THE INTERPRETER:  Interpreter corrects himself.

10   A.  976 Prospect Avenue in the Bronx.

11   Q.  What type of store is it, Mr. Gonzalez?

12   A.  It's a small grocery store.

13   Q.  When you say "small", can you describe the store to me,

14   Mr. Gonzalez?

15   A.  It's a -- the type of grocery store that has very small

16   sales.

17   Q.  Can you tell me does -- how many cash registers are located

18   in the store?

19   A.  One.

20   Q.  And behind the counter or where there's an area does the

21   store prepare food?

22   A.  Sandwiches.

23   Q.  Can you tell me what kind of machines are used in the

24   preparation of sandwiches?

25   A.  There is a grill, a toaster and a microwave.
```

F6UAAAPO2                        Gonzalez - Direct

1   Q.   Is there also a deli slicer?

2   A.   Yes, there's a slice machine.

3   Q.   Thank you.  And you had stated -- what is the majority of

4   the food that is prepared on those machines?

5   A.   Sandwiches, bacon, eggs and cheese, cheese and ham

6   sandwiches, buttered rolls, cream cheese rolls.

7   Q.   Is the majority of the food just toasted?

8   A.   Fried and toasted.

9   Q.   Where is the food fried?

10  A.   Cold and toasted.

11  Q.   Can you say that again.  I am sorry.  I didn't understand.

12  A.   Cold and hot.

13  Q.   OK.  So you prepared cold and hot sandwiches?

14  A.   Yes, sir.

15  Q.   And the machines, most of this food that you prepare is

16  toasted or what exactly, Mr. Gonzalez?

17  A.   They're heated.  They're hot.

18  Q.   What's heated?

19  A.   In the toaster.

20  Q.   What's toasted in the toaster?

21  A.   Bread.

22  Q.   Is there any meats that are prepared?

23  A.   Bacon, beef steaks, and cheese, lettuce and tomato.

24  Q.   How is the beef prepared?

25  A.   Hot.

1    Q.   Is the meat already cooked?

2    A.   No.  It's cooked on the griddle.

3    Q.   Is there any other preparation in food other than the meats

4    for sandwiches?

5    A.   No, regular, regular sandwich, whatever the people ask for,

6    turkey, cheese.

7    Q.   Does the store cook rice?

8    A.   No.

9    Q.   Does the store cook potatoes?

10   A.   No.

11   Q.   Mashed potatoes?

12   A.   Well, French fries.

13   Q.   Does the business do delivery of the food, Mr. Gonzalez?

14   A.   No, we don't do deliveries.  No.

15   Q.   Is that just of food or any other product in the store?

16   A.   Any product, no products.

17   Q.   So there's no delivery of any product?

18   A.   No, no deliveries.

19   Q.   Thank you, Mr. Gonzalez.

20   A.   OK.

21   Q.   Mr. Gonzalez, how many employees work at any one time at

22   the store?

23   A.   We have two working in the morning and two in the evening.

24   Q.   Did there come a time when the plaintiff became employed by

25   your business?

1   A.   When I took over the business he had been working there for

2   years.

3   Q.   When was that, approximately?

4   A.   In 2008.  I'm not certain.

5   Q.   Where were -- when you took over the business as you state,

6   what were the plaintiff's hours of employ?

7   A.   He had a normal schedule.

8   Q.   What were his hours?

9   A.   He opened.

10  Q.   At what time?

11  A.   He returned at -- he left at ten and he returned at three

12  to finish off his complete schedule.

13  Q.   What time you said opened?  What time was that that he

14  opened?

15  A.   Seven in the morning.

16  Q.   And when he would return at three, up to what time would he

17  work?

18  A.   He worked until 11 at night.

19  Q.   What days of the week did he have those hours?

20  A.   From Mondays through Friday till 11 and on Sundays at ten

21  and he didn't work on Saturdays.

22  Q.   Thank you.  What were his hours again on Sundays, please?

23  A.   On Sundays it was from ten.  Sorry.  On Sundays it was from

24  eight.  We opened the business on Sundays at eight and closed

25  it at ten but he worked -- he came in at one in the afternoon

F6UAAAPO2                    Gonzalez – Direct

1    until ten o'clock.

2    Q.  Did his hours ever change?

3    A.  Yes.  Anything might have come up that might have changed

4    it on any given date.

5    Q.  Such as?

6    A.  Well, if he had some sort of an errand that he had to do or

7    something like that.

8    Q.  Were his hours ever changed permanently from these hours

9    that you're giving?

10   A.  He already had a turn.  He had a turn when I began.  At

11   that time he did his turn when I first arrived from seven until

12   three in the afternoon.

13   Q.  Was that in 2008?

14   A.  Yes, when I made the corporation.

15                (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F6urapo3                           Gonzalez – direct

```
 1   Q.  When did, to the best of his knowledge, the hours change?
 2   Was it a year after you bought the business?
 3   A.  Something like that.  I don't remember.  I'm not certain.
 4   My head is a bit -- I have a problem.
 5   Q.  Mr. Gonzalez, let me ask you a few questions regarding some
 6   allegations.  Did you ever threaten the plaintiff?
 7   A.  No, never.
 8   Q.  Did you ever threaten the plaintiff at any time either
 9   before or after plaintiff began this lawsuit?
10   A.  No, never.
11   Q.  Did you ever tell the plaintiff that you would report him
12   to immigration?
13   A.  No.
14   Q.  Did you ever threaten the plaintiff that you would report
15   him to the police for any act that occurred in the store?
16   A.  On the occasion when he left the business, I called the
17   police because he had come back and he was outside the business
18   at night.
19   Q.  What was he doing?
20   A.  He left.  He fought with me.  His things were thrown out.
21   He insulted me.  He called me a black.  He called me a son of a
22   bitch.  He went home and came back, and he was in the doorway,
23   and that's when I called the police.
24   Q.  What resulted from the call to the police?
25   A.  Because I didn't know what his intentions were.
```

F6urapo3                         Gonzalez – direct

1   Q.  Did the police come to the store?

2   A.  Yes.

3   Q.  Did the police file a report?

4   A.  They told him to leave, and they gave me a telephone number

5   or something like that that I could call if he came back again.

6   Q.  Did you ever call or did he ever come back again?

7   A.  No, he did not come back.

8   Q.  You stated that he had argued with you before he left.

9   What occurred?  What exactly happened?

10  A.  Are you talking about on that same day or the prior day

11  before that?

12  Q.  Was there more than one incident?

13  A.  One time before that, when he began to argue, I left, and I

14  was outside the counter and he was behind the counter.  We

15  began to argue.  He insulted me.  And he left.  He went

16  outside.  My brother was there.  My brother had to get between

17  the two of us so that he didn't hit me.

18  Q.  Did you call the police for that incident?

19  A.  No, I didn't call the police, because he didn't hit me.

20  Q.  That incident occurred the day before you called the police

21  then?

22  A.  More than two days before that, a considerable amount of

23  time before that.

24  Q.  So the incident where you called the police, was that when

25  the employee left the establishment?

1   A.   No.  He went for his things and he left, arguing.

2   Q.   Mr. Gonzalez, have you ever contacted the police or any

3   government agency, either immigration, NYPD police, or other

4   government agency, child support, threatening a complaint

5   against the plaintiff?

6   A.   No, I didn't have any reason to do that.  I didn't do that.

7   Q.   What do you mean you didn't have any reason?

8            THE INTERPRETER:  The interpreter corrects himself for

9   the record.

10  A.   I didn't have the heart to do that.

11  Q.   Mr. Gonzalez, I'm going to show you a series of pictures.

12  If you could explain to us what exactly we are looking at.

13           MR. ANDROPHY:  Objection.

14           MR. HIDALGO:  I'm going to lay a foundation, your

15  Honor.  These are pictures of the store.  I would like to admit

16  them.  I would just like my client to state exactly what we are

17  looking at.

18           THE COURT:  I think the basis for the objection is

19  that in the joint pretrial order you were obliged to identify

20  all of the exhibits in advance of trial.  That is the purpose

21  of the joint pretrial order which I so ordered at the outset of

22  this trial.  As you know, after I've entered that order

23  pursuant to rule 16(e), I can only modify it under limited

24  circumstances, if justice requires.

25           Do you care to make a proffer about what it is that

1    you are seeking to introduce?

2             MR. HIDALGO:  Your Honor, my client just gave me the

3    pictures this morning when he came in.  We have been speaking

4    about what size or how large the store is.  The pictures

5    indicate the store from the outside.  There is also pictures of

6    the individual aisles of the store so that the Court can see in

7    pictures what exactly we are talking about, the size of the

8    store.  There is also a picture that shows an area behind the

9    counter.

10            The evidence is for amplification of the size of the

11   store.  The size of the store was mentioned both in testimony

12   by the plaintiff and the defendant.  The pictures will just

13   enumerate that.

14            THE COURT:  Mr. Androphy?

15            MR. ANDROPHY:  I continue my objection not just on the

16   grounds that I have not -- these photographs were not listed in

17   the trial order as defendants' exhibits.  I have not been shown

18   them by counsel.  I don't have a copy of them in front of me

19   right now.  I continue the objection.

20            THE COURT:  I am going to allow you, Mr. Hidalgo, to

21   continue with respect to these photographs.  While they were

22   not disclosed previously, while they were not included in the

23   joint pretrial order, I believe that it will be helpful for me

24   to evaluate the facts of this case.  Therefore, I'm going to

25   allow you to continue.

1          Just a note for counseling and then a note with

2    respect to procedural matters.  Counseling, this is the point

3    of the joint pretrial order.  The parties are supposed to

4    provide each other with exhibits and disclose them before

5    trial.  Certainly before I signed the joint pretrial order, it

6    was incumbent on you to disclose these exhibits.  I am not

7    going to prejudice your client because of your failure.  I

8    think these are pieces of evidence that would be helpful for

9    me.

10          The procedural matter that this raises, however, is

11    the fact that you chose, Mr. Hidalgo, not to produce these

12    exhibits prior to this moment.  As a result, Mr. Androphy, to

13    the extent that you wish to reopen your case to ask your client

14    any questions about these exhibits or what they show, I will

15    allow you to do so.

16          MR. ANDROPHY:  Thank you, your Honor.

17          THE COURT:  Please proceed, Mr. Hidalgo.

18          MR. HIDALGO:  Thank you, your Honor.

19    BY MR. HIDALGO:

20    Q.  Mr. Gonzalez, I'm going to show you a series of pictures.

21    If you could please explain to me what we are looking at.

22          THE COURT:  Mr. Hidalgo, let's go through the standard

23    protocol with respect to these images, which would entail

24    having you mark an individual exhibit as, call it Defendants'

25    A1 for identification purposes.  Mr. Daniels will help you with

1   this.  You will then introduce your questioning with respect to

2   each item by saying, I'm showing you, witness, an exhibit that

3   has been marked for identification purposes as Defendants'

4   Exhibit, insert number.

5          Before you show the witness each of the images, you

6   should also show it to Mr. Androphy so that he can see it.

7   Proper court protocol would have you providing me with a copy

8   of each of the images so that I can be looking at it at the

9   same time that you are showing it to the witness.  Here you

10  appear to have unique copies of each of these images and you

11  appear to only have one copy of each.  The unusual approach

12  that you are taking with these pieces of evidence will require

13  that we be somewhat flexible, and I will be flexible.

14         Please, with respect to the means by which you

15  identify each of the images that you intend to use, follow

16  standard protocol as I have just outlined it to you.

17         MR. HIDALGO:  Thank you, your Honor.

18  BY MR. HIDALGO:

19  Q.  Mr. Gonzalez, the store is located, you had said, where

20  exactly in the Bronx?

21  A.  976 Prospect Avenue.

22  Q.  By what name does the business operate, Mr. Gonzalez?

23  A.  Luis Angie Deli Grocery.

24  Q.  Mr. Gonzalez, I'm going to show you a picture.  If you

25  could explain to me what exactly we are looking at here.

1   A.  This is the front of the grocery store.

2   Q.  Did that picture that we are looking at, did you take that

3   picture, Mr. Gonzalez?

4   A.  Yes, sir.

5   Q.  When did you take that picture, Mr. Gonzalez?

6   A.  On the 20th of May.

7   Q.  Of what year, Mr. Gonzalez?

8   A.  In 2015.

9   Q.  What time of day did you take the picture, approximately?

10  A.  Around 4:00 in the afternoon, somewhere around then.

11  Q.  Does the picture fairly and accurately describe or show the

12  store as it appears today?

13  A.  Yes, it's like that exactly.

14  Q.  Can you tell me, does the name of the store appear anywhere

15  on that picture?

16  A.  Yes, the sign, Angie Deli Grocery.

17  Q.  Is the entrance to the store also visible on the picture?

18  A.  Yes, 976.

19  Q.  Is that 976 Prospect Avenue in the Bronx?

20  A.  Yes, sir.

21  Q.  Thank you, Mr. Gonzalez.

22          MR. HIDALGO:  Your Honor, I would like to admit

23  Defendants' Exhibit 1, a picture of the front of the store.

24          THE COURT:  Is Defendants' Exhibit 1 that Mr. Gonzalez

25  was just describing?

F6urapo3                    Gonzalez – direct

1          MR. HIDALGO:  Yes, your Honor.

2          THE COURT:  Mr. Androphy?

3          MR. ANDROPHY:  No objection.

4          THE COURT:  Thank you.  May I see it, please.

5          MR. HIDALGO:  Yes, your Honor.

6          THE COURT:  The Court is accepting into evidence

7    Defendants' Exhibit 1.

8          (Defendant's Exhibit 1 received in evidence)

9    Q.  Mr. Gonzalez, I'm going to show you another picture.  If

10   you can please tell the Court what we are looking at in this

11   picture.

12   A.  Yes.  The front of the grocery store at the corner, the

13   corner.

14   Q.  When you say at the corner, what do you mean?

15   A.  It covers the complete grocery store, the complete corner

16   of the grocery store.

17   Q.  Is the business located on the corner?

18   A.  Yes, 976 Prospect Avenue in the Bronx.

19   Q.  Is the sign on the store visible in that picture?

20   A.  Yes, you can see it clearly.

21   Q.  Does it also show the address of the store on there?

22   A.  Yes.

23   Q.  What address is that?

24   A.  976 Prospect.

25   Q.  Thank you.

1          MR. HIDALGO:  Your Honor, I would like to introduce as

2     Defendants' Exhibit 2 a picture of the store that shows a side

3     angle of the store.

4          THE COURT:  Is it Defendants' 2 that you were just

5     discussing with Mr. Gonzalez?

6          MR. HIDALGO:  That's correct, your Honor.

7          THE COURT:  Mr. Androphy?

8          MR. ANDROPHY:  No objection.

9          THE COURT:  Thank you.  The Court is accepting

10    Defendants' Exhibit 2 into evidence.

11          (Defendant's Exhibit 2 received in evidence)

12    BY MR. HIDALGO:

13    Q.  Mr. Gonzalez, I'm going to show you a picture.  If you can

14    please tell me what we are looking at here.

15          THE COURT:  Showing the picture that has been marked

16    as Defendants' Exhibit 3 for identification?

17          MR. HIDALGO:  That's correct, your Honor.

18          THE COURT:  Thank you.

19    Q.  Mr. Gonzalez, can you tell us what we are looking at.

20    A.  We are looking at the central aisle in the grocery store.

21    Q.  Did you take this picture, Mr. Gonzalez?

22    A.  Yes, sir.

23    Q.  When did you take the picture, Mr. Gonzalez?

24    A.  On the 20th of May 2015.

25    Q.  Does the picture fairly and accurately show the center

F6urapo3                    Gonzalez - direct

1    aisle in your store?

2    A.  Yes.

3    Q.  Did you also take this picture contemporaneous with the

4    picture you took on the outside of the store?

5    A.  Yes.

6    Q.  When you say it's in the middle aisle, how many aisles are

7    there, Mr. Gonzalez?

8    A.  One, two, three aisles.

9            MR. HIDALGO:  Your Honor, I would like to admit

10   Defendants' Exhibit 3, the middle aisle of the store.

11           THE COURT:  Mr. Androphy?

12           MR. ANDROPHY:  No objection.

13           THE COURT:  Thank you.  The Court is accepting

14   Defendants' Exhibit 3 into evidence.

15           (Defendant's Exhibit 3 received in evidence)

16   Q.  Mr. Gonzalez, I'm about to show you a picture.  If you can

17   please tell me what we are looking at.

18   A.  Yes.  Once again, it's the central aisle but looking more

19   at the right-hand side.

20   Q.  Is this a picture that you personally took, Mr. Gonzalez?

21   A.  Yes, sir.

22   Q.  When did you take that picture, Mr. Gonzalez?

23   A.  On the 20th of May 2015.

24   Q.  Does the picture fairly and accurately describe that aisle?

25   A.  Yes.

F6urapo3                         Gonzalez – direct

1   Q.  Thank you, Mr. Gonzalez?

2            MR. HIDALGO:  Your Honor, I would like to enter into

3   evidence Defendants' Exhibit 4, which is another portion of the

4   aisle, Exhibit 4, defendants' exhibit.

5            THE COURT:  That is the image you were just discussing

6   with Mr. Gonzalez?

7            MR. HIDALGO:  That's correct, your Honor.

8            THE COURT:  Mr. Androphy?

9            MR. ANDROPHY:  No objection.

10           THE COURT:  Thank you.  The Court is accepting into

11  evidence Defendants' Exhibit 4.

12           (Defendant's Exhibit 4 received in evidence)

13  Q.  Mr. Gonzalez, I'm about to show you a picture.  If you can

14  please tell me what we are looking at.

15  A.  This is the number 3 aisle.

16  Q.  This is the third aisle where, Mr. Gonzalez?

17  A.  Entering, it would be on the left-hand side.

18  Q.  Did you take this picture, Mr. Gonzalez?

19  A.  Yes, sir.

20  Q.  When did you take it?

21  A.  On May 20, 2015.

22  Q.  Does the picture fairly and accurately describe that aisle?

23  A.  Yes.

24  Q.  Thank you.

25           MR. HIDALGO:  Your Honor, we would like to enter into

1  evidence Defendants' Exhibit 5, the third aisle of the store.

2         THE COURT:  This is the image you were you discussing

3  with Mr. Gonzalez?

4         MR. HIDALGO:  That's correct, your Honor.

5         THE COURT:  Mr. Androphy?

6         MR. ANDROPHY:  No objection.

7         THE COURT:  The Court is accepting into evidence

8  Defendants' Exhibit 5.

9         (Defendant's Exhibit 5 received in evidence)

10 Q.  Mr. Gonzalez, I'm about to show you a picture.  If you can

11 please tell me what we are looking at.

12 A.  This is the rear part of the grocery store.

13 Q.  Did you take this picture, Mr. Gonzalez?

14 A.  Yes, sir.

15 Q.  When did you take it?

16 A.  On the 20th of May 2015.

17 Q.  Does this picture fairly and accurately describe that rear

18 part of the store?

19 A.  Yes, sir.

20 Q.  Thank you.

21        MR. HIDALGO:  Your Honor, we would like to enter into

22 evidence Defendants' Exhibit 6 that the defendant was just

23 describing.  Defendants' Exhibit 6.

24        THE COURT:  Mr. Androphy?

25        MR. ANDROPHY:  No objection.

1          THE COURT:  The Court is accepting into evidence

2    Defendants' Exhibit 6.

3          (Defendant's Exhibit 6 received in evidence)

4    Q.  Mr. Gonzalez, I'm about to show you a picture.  If you

5    could please tell me what exactly we are looking at here.

6    A.  This is the entrance aisle on the right of the grocery

7    store.

8    Q.  Did you take this picture, Mr. Gonzalez?

9    A.  Yes, sir.

10   Q.  When did you take it?

11   A.  On the 20th of May 2015.

12   Q.  Does the picture fairly and accurately describe that front

13   of the store?

14   A.  Yes, sir.

15          MR. HIDALGO:  Thank you, Mr. Gonzalez.

16          Your Honor, we would like to enter Defendants' Exhibit

17   number 7.  That is a picture of the front that the defendant

18   was just describing.  Exhibit 7.

19          MR. ANDROPHY:  I don't think I've seen that photo.

20          MR. HIDALGO:  I'm sorry.

21          MR. ANDROPHY:  Thank you.  No objection.

22          THE COURT:  The Court is accepting into evidence

23   Defendants' Exhibit 7.

24          (Defendant's Exhibit 7 received in evidence)

25   BY MR. HIDALGO:

F6urapo3                      Gonzalez - direct

1   Q.  Mr. Gonzalez, we have just looked at some pictures of the

2   store describing what the store is.  Can you tell me, how many

3   registers are in the store?  I don't know that I asked you that

4   question.  How many cash registers are in the store?

5            MR. ANDROPHY:  Objection.  Asked and answered.

6   Q.  Mr. Gonzalez, how large is the counter that people pay for

7   their goods where they bring their products?  How large is the

8   counter?

9   A.  Barely four feet maybe.

10  Q.  How many people are generally behind the counter?

11  A.  One person, me.

12  Q.  Is there anyone else other than you behind the counter?

13  A.  Yes.  Sometimes another employee will remain at night.

14  Q.  Are you the only person that rings up the sales when you

15  are in the store?

16  A.  Yes.

17  Q.  The other person that rings up the store sales, is that the

18  only other person authorized on the cash register?

19  A.  Yes, sir.

20  Q.  Who closes out the cash register?

21  A.  If I'm not there to close it out, the person that's

22  there -- if I'm not working and I work 10 hours in a row, then

23  the person who remain closes up the register.

24  Q.  Do you ever close out the register when you are leaving in

25  the middle of the day?

F6urapo3                    Gonzalez - direct

1   A.  No.

2   Q.  So it is just closed when the business is closing?

3   A.  Yes, sir.

4   Q.  Mr. Gonzalez, the plaintiff worked a series of hours, I

5   think you had stated, since '08 in your store.

6   A.  Yes.

7   Q.  Did the plaintiff ever work any hours greater than 40 hours

8   a week?

9   A.  On occasion, yes.

10  Q.  Did the business ever pay the plaintiff overtime for

11  working greater than those hours?

12          MR. ANDROPHY:  Objection.  Leading.

13          THE COURT:  I'm going to ask you to refrain from

14  leading the witness.  You can rephrase the question.

15  Q.  Mr. Gonzalez, does the business pay overtime for employees?

16          MR. ANDROPHY:  Objection.

17          THE COURT:  Sustained.

18  A.  Yes.

19          THE COURT:  Sir, if I sustain the objection, you need

20  not respond to the question.

21          THE WITNESS:  Oh, OK.

22          THE COURT:  Thank you.  Proceed.

23          THE WITNESS:  Sorry.

24  Q.  Mr. Gonzalez, the plaintiff, you stated, sometimes worked

25  greater than 40 hours a week?  You stated the plaintiff worked

F6urapo3                         Gonzalez - cross

1    more than 40 hours on occasion?

2    A.  Yes.

3    Q.  You said on occasion he worked.  Was that the exception?

4    A.  Yes.  He was paid $10 an hour.

5    Q.  Is that the overtime rate, Mr. Gonzalez?

6    A.  Actually, I don't know.

7             MR. HIDALGO:  Your Honor, I rest my case.

8             THE COURT:  Thank you.  We will come to resting the

9    case momentarily.  Let's first hear from Mr. Androphy with

10   respect to any cross-examination.

11            MR. ANDROPHY:  Thank you, your Honor.

12   CROSS-EXAMINATION

13   BY MR. ANDROPHY:

14   Q.  Mr. Gonzalez, Luis Angie Deli sells food that is prepared

15   on-site at Luis Angie Deli, correct?

16   A.  Yes, sir.

17   Q.  Some of those foods are prepared on the grill at Luis Angie

18   Deli, correct?

19   A.  No.  Either on the griddle or on the toaster.

20   Q.  I think you mentioned that your store sells chicken and

21   beef, bacon, is that correct?

22   A.  Yes.

23   Q.  Are those foods prepared to be cooked at Luis Angie Deli?

24   A.  Yes, for the sandwiches.

25   Q.  For example, are those meats or chickens marinated Luis

F6urapo3                    Gonzalez - cross

1    Angie Deli?

2    A.   Yes.

3    Q.   Or some spices might be put on some before they are cooked,

4    is that correct?

5    A.   Yes, some spices are added.

6    Q.   You testified that there are no deliveries done at Luis

7    Angie Deli.  Have there ever been deliveries made from Luis

8    Angie Deli to customers?

9    A.   A while back, yes, a few deliveries were made, but for very

10   small items.  But very few deliveries were made.  I might say

11   maybe four or five deliveries in any given day.  Now no.  We

12   serve on premises.  There are no deliveries.

13   Q.   Do you recall when Luis Angie Deli stopped providing

14   deliveries?

15   A.   About a little over two years ago.

16   Q.   I believe you testified that Luis Angie Deli has two

17   employees working at a time, is that correct?

18   A.   Yes.

19   Q.   Have there ever been more, three or four, employees working

20   at a time in previous years?

21   A.   Yes.  Previously in the past exactly when he was there.

22   Q.   When Mr. Apolinario worked there, there were usually at

23   least three employees working at a time, is that correct?

24   A.   Yes.

25   Q.   You testified about Mr. Apolinario's schedule and that he

F6urapo3                              Gonzalez - cross

1    would work Monday through Friday until 11:00.  Did he ever have

2    to stay later than 11:00?

3    A.  No.

4    Q.  He never had to work late because there were customers past

5    11 o'clock?

6    A.  No, never.  We close at 11 o'clock at night.

7    Q.  If there were customers waiting, would the deli close or

8    would it stay open a little later to serve those customers?

9    A.  They would close.

10   Q.  I believe you testified earlier, when your attorney was

11   asking you questions, that Mr. Apolinario was paid $10 per

12   hour.  Are you sure that that's correct?

13   A.  When he was at 7:00, they were paid $10 an hour always.

14   Q.  When was that, sir?

15   A.  When it was 7 to 15, they paid $10, always paid $10.

16   Q.  When you say when it was 7:15, do you mean --

17          THE INTERPRETER:  No.  When it was 7 to 15.

18   Q.  You're saying --

19   A.  When the hour of arrival was 7:15, they were paid $10 an

20   hour.

21   Q.  That's what Mr. Apolinario was paid?

22   A.  He was paid $10 an hour.

23   Q.  Isn't it true that Mr. Apolinario was first paid a straight

24   weekly salary of $875 per week?

25   A.  When he was paid for his 7:00 to 3:00 turn Monday through

F6urapo3                              Gonzalez - cross

1    Friday, he was paid $475.

2            THE INTERPRETER:  Shift.  The interpreter corrects

3    himself.  Shift, not turn.

4    Q.  In 2008 and 2009, what was Mr. Apolinario's schedule on

5    Monday through Friday?

6    A.  He opened the store at 7:00 a.m.  He went to his home at

7    10:00.  Then he returned either at 2:00 or 3:00 in the

8    afternoon and remained until closing time, until he closed the

9    bodega at 11 o'clock at night.

10   Q.  Do you maintain that was his schedule throughout the time

11   until he stopped working at Luis Angie Deli?

12   A.  Yes.

13   Q.  Or did his schedule change at some point?

14   A.  No, that was his schedule.

15   Q.  What do you claim Mr. Apolinario was paid when he worked

16   that schedule?

17   A.  He was paid 475 for that schedule plus the overtime.

18   Q.  What overtime was he paid?

19   A.  According to the amount of time that he worked, he would be

20   paid 2 or 3 hours depending on when he returned from home.

21   Q.  Isn't it true that from around 2008 until around August

22   2009 plaintiff Apolinario was paid a flat weekly salary of $875

23   dollars per week?

24   A.  No.  It varied because the amount of time that he went home

25   varied.

F6urapo3                         Gonzalez - cross

1    Q.  Is it true that from approximately September 2009 until he

2    stopped working at Luis Angie Deli, Mr. Apolinario was paid a

3    flat weekly salary of $715 per week?

4    A.  It varied.  The lawyer has the tally of when he worked.

5    Everything is contained in that tally that the attorney has of

6    the hours that he worked, when he entered, and when he left.

7    Q.  I'm going to show you two documents that have been marked

8    as Plaintiff's Exhibit 1 and Plaintiff's Exhibit 2.  Do you

9    recognize Plaintiff's Exhibit 1?

10   A.  I don't know how to read English.  I don't know.

11   Q.  I'll represent to you that Plaintiff's Exhibit 1 is the

12   amended complaint filed by the plaintiff that contains the

13   allegations against you and Luis Angie Deli Grocery, Inc. in

14   this case.  If you can look at Plaintiff's Exhibit 2.  Do you

15   recognize that document?

16   A.  I don't know.  I've never seen this document.

17   Q.  I'll represent to you that this is a document called an

18   answer that was filed by your previous attorneys responding to

19   the allegations in Exhibit 1.

20           MR. ANDROPHY:  If I could ask the interpreter to

21   interpret paragraph 1 of the answer for the defendant.  I'm

22   sorry.  Paragraph 1 of the answer, Plaintiff's Exhibit 2.  It

23   starts "Defendants admit the allegations."

24           THE INTERPRETER:  I'm sorry.  I'm looking at something

25   that has your letterhead as the person it's directed to, so I

1   assumed that that was right.

2            MR. ANDROPHY:  Plaintiff's Exhibit 2.

3            THE INTERPRETER:  Paragraph 1?

4            MR. ANDROPHY:  The paragraph numbered paragraph 1,

5   starting, "The defendants admit the allegations."

6            THE INTERPRETER:  Subsection number 1.

7            (Document read in Spanish)

8            MR. ANDROPHY:  Thank you.

9            THE INTERPRETER:  You're welcome.

10  Q.  The defendants admitted in their answer that paragraph 48

11  of the first amended complaint is correct.  Do you understand

12  that?

13  A.  No, I don't understand that.

14  Q.  Did you understand the interpretation given by the

15  interpreter of paragraph 1 of the answer?

16  A.  No, I didn't understand it well.

17           MR. ANDROPHY:  If the interpreter could read from the

18  other document there, the first amended complaint, paragraph

19  48, which is on page 8.  I'll read it into the record, and if

20  the interpreter can then interpret the Spanish for the witness.

21           Paragraph 48 reads, "From approximately 2008" --

22           THE INTERPRETER:  Just a moment, counselor.  I seem to

23  have a stuck page.  OK, I've got it.

24           MR. ANDROPHY:  The last paragraph.  "From

25  approximately March 2008 until on or about August 2009,

1   plaintiff Apolinario was paid a flat weekly salary of $875 per

2   week."

3   Q.  Mr. Gonzalez, in the answer that your attorneys filed on

4   your behalf, they wrote, "Defendants admit the allegations in

5   paragraph 48."  Are the allegations in paragraph 48 that the

6   interpreter just interpreted for you correct?

7   A.  Yes.

8   Q.  If I can turn to the next page of the complaint, page 9,

9   paragraph 50.  I'll read it, and then if the interpreter can

10  interpret it for the witness.

11          "From approximately September 2009 until the present

12  date, plaintiff Apolinario has been paid a flat weekly salary

13  of $715 per week."

14          Mr. Gonzalez, in the answer that your attorney filed

15  on your behalf, it says in paragraph 1 that the defendants

16  admit the allegation in paragraph 50 of the first amended

17  complaint, which is the paragraph that we just read and that

18  the interpreter interpreted.  Mr. Gonzalez, is it true that

19  from September 2009 plaintiff Apolinario was paid a flat weekly

20  salary of $715 per week

21  A.  That varied depending on the amount of time because he

22  himself was changing the schedule.  He would leave at one hour,

23  at 2:00 in the afternoon or 3:00 in the afternoon, and we paid

24  him $10 per hour according to the hours that he was there.

25          (Continued on next page)

F6UAAAPO4                    Gonzalez - Cross

 1   BY MR. ANDROPHY:

 2   Q.  So, are you saying that now when your attorney said that

 3   you admit the allegation in paragraph 50 that plaintiff

 4   Apolinario was paid a flat weekly salary of $715 per week, are

 5   you saying now that was a mistake?

 6   A.  It varied at that time.  It varied in terms of the amount

 7   of time during that period of time.  There was no exact salary.

 8   Q.  But in this document your attorney said that that

 9   allegation was correct.  Do you know why that is?  Do you know

10   why your attorney said that allegation was correct?

11   A.  I don't know because that varied weekly.

12   Q.  OK.  You reviewed with your attorney a series of

13   photographs in your direct testimony.  You did not show us a

14   photograph of the deli section of Luis Angie Deli; is that

15   correct?

16   A.  There must be one there.

17   Q.  In the photographs we looked at you didn't show us one,

18   correct?

19   A.  Please, ask the attorney.

20   Q.  I am not asking about any other photographs you have.  But

21   in the photographs you were already shown while testifying you

22   didn't look at a photograph of the deli section, correct?

23   A.  I don't know whether it was included or not because the

24   deli itself was barely -- excuse me.  The deli.

25   Q.  There is a deli section in Luis Angie Deli, correct?

F6UAAAPO4                 Gonzalez - Cross

1   A.  Yes.  Behind the cash register, behind that counter there,

2   maybe 12 feet.  You have a griddle, a toaster, the place where

3   they working and the coffee urn and in front of that the slice

4   machine.  And then what do you call that thing where you put

5   the things into it?  The microwave.  And that's all that there

6   is there.

7   Q.  OK.  And --

8   A.  Excuse me.  And the fryer or the French fried potatoes.

9   Q.  And Mr. Apolinario usually worked in the deli section,

10  correct?

11  A.  Yes.

12  Q.  OK.  Now you testified about some arguments you had with

13  Mr. Apolinario.  Were those arguments about the lawsuit that

14  he's brought against you?

15  A.  No, not in the beginning.  He would argue with all of the

16  employees.  He was a violent person.

17  Q.  OK.  Well --

18  A.  He would menace with a knife at -- there were three

19  employees there, at all three employees.  And also my brother

20  who came in from Santo Domingo he also with the knife.

21  Q.  OK.  I'm asking specifically about the arguments after or

22  around the time that he stopped work at Luis Angie Deli.

23  A.  The first time that he did that was before that.

24  Q.  OK.  Mr. Gonzalez, please, I am asking specifically about

25  the ones at the end.

F6UAAAPO4                      Gonzalez – Cross

1   A.  That was in February of the past year around January or

2   February of the past year.

3   Q.  I am not asking about anything other than the arguments

4   that happened around the time that he stopped working at Luis

5   Angie Deli.  What were those arguments about?

6   A.  No.  It's just a question of the fact that he was a very

7   violent person.  He would begin to fight with me behind the

8   counter.  He would begin to fight and argue in front of other

9   people.  I have it written down.  (In English) One lady, three

10  men and my employee.

11  Q.  Mr. Gonzalez, I am asking specifically what happened -- let

12  me start over.  You testified earlier that there was an

13  incident where Mr. Apolinario had left the deli and then came

14  back.  At around that time did you have an argument with him

15  where you asked him to withdraw this lawsuit?

16  A.  Excuse me?  Excuse me?

17  Q.  Did you have an argument with Mr. Apolinario where you

18  asked him to withdraw this lawsuit?

19  A.  No.

20  Q.  Did Mr. Apolinario stop working at Luis Angie Deli because

21  you fired him for bringing this lawsuit?

22  A.  No, I never asked him to leave before that.  He had filed

23  these charges against me and I never fired him from the grocery

24  store.  He continued to work normally.  Up until the day when

25  he started to argue with me behind the counter, gathered up all

F6UAAAPO4                        Gonzalez - Cross

1    his belongings and left.  The attorney has a video of that day

2    when he insulted me and he gathered all of his things together

3    and left.  He has a video of that day.

4    Q.  Did you ever pressure Mr. Apolinario to stop this lawsuit?

5    A.  No, I never did anything, never.  On one occasion I asked

6    him whether or not we might reach an agreement so that he would

7    not continue with the suit because the attorneys fees were

8    putting the grocery store into bankruptcy.  So we discussed

9    with his attorney giving him, settling the case for $10,000,

10   giving him $10,000 not to continue with the case.  But I didn't

11   have it.  I had to borrow the money in order to do it and the

12   witness knows that I was looking for ways of borrowing the

13   money.  So some employee from a place in front told him that he

14   was stupid that he shouldn't accept that and so he then went

15   back to where he was before and continued.  And so then after

16   that he started by asking me for 20,000 and then 25,000 and

17   then 30,000.  And there are 25 witnesses to that effect in

18   front of whom he asked me that.  And I have everything that he

19   said to me recorded on the cellular telephone.

20             MR. ANDROPHY:  I have no further questions for the

21   witness.

22             THE COURT:  Thank you very much.

23             Mr. Hidalgo.

24             MR. HIDALGO:  No, your Honor.

25             THE COURT:  Thank you.  No further questions.  Thank

1    you.

2                Mr. Gonzalez, thank you for your testimony.  You may

3    step down.

4                THE WITNESS:  Thank you, your Honor.

5                THE COURT:  Thank you.

6                Mr. Hidalgo.

7                MR. HIDALGO:  I said I had no further questions, your

8    Honor.

9                THE COURT:  Thank you.  This is the opportunity to

10   call any other witnesses.

11               MR. HIDALGO:  There are no other witnesses, your

12   Honor.

13               THE COURT:  Thank you.  Is the defense resting?

14               MR. HIDALGO:  We are, your Honor.

15               THE COURT:  Thank you.

16               Mr. Androphy, I told you at the time that when the

17   defendants offered the exhibits which had not been previously

18   identified in the joint pretrial order or otherwise that I

19   would afford you the opportunity to reopen your case to the

20   extent that those unanticipated exhibits required that you

21   respond and I am going to afford you that opportunity now.

22               MR. ANDROPHY:  Thank you, your Honor.  I don't have

23   any questions for Mr. Apolinario about those photos.

24               THE COURT:  Good.  Thank you very much.

25               So I understand that both parties have rested their

1    cases.  Thank you very much.  Do either of you care to make

2    closing statements?

3              Mr. Androphy.

4              MR. ANDROPHY:  Yes.  Would you want that right now or

5    could we have --

6              THE COURT:  Yes.

7              MR. ANDROPHY:  OK.

8              THE COURT:  Or I'm sorry.

9              MR. ANDROPHY:  About five minutes.

10             THE COURT:  Thank you.  I'd be willing to do that.  It

11   is now 12:15.  We will take a half hour break.  I will return

12   at 12:45 for any closing statements that the parties would like

13   to make.  I also anticipate that I'll use that opportunity to

14   ask you questions about your theory of the case but before I

15   ask any questions I'd like to give each of you the opportunity

16   of providing me your views of the evidence, what it is that

17   you've proved or what it is or why it is that you believe, in

18   the case of defendants, why the plaintiffs have failed to meet

19   their burden in this case.

20             So we are in recess until 12:45.  I will see you all

21   then.  Thank you.

22             (Recess)

23             THE COURT:  Thank you.  You can be seated.

24             So, Mr. Androphy, would you like to begin?

25             MR. ANDROPHY:  Yes.  Thank you, your Honor.

F6UAAAPO4                    Summation - Androphy

```
 1              At the close of the testimony that we've heard today I
 2    respectfully submit that there can be no question that the
 3    defendants violated the overtime laws of the Fair Labor
 4    Standards Act and New York Labor Law.  The only question really
 5    I think for the Court to determine is how much plaintiff is
 6    owed.  And we submit that plaintiff's testimony about the hours
 7    that he worked and the wages that he received while he worked
 8    for the defendants at Luis Angie Deli was far more credible
 9    than the testimony of the defendants.
10              Mr. Apolinario testified that in 2008 until some point
11    in 2009 he was paid a flat weekly salary of $875 per week and
12    later his schedule changed, his pay changed, his pay went down
13    to $715 per week.  Now defendants in their answer to the
14    amended complaint, they admitted those very allegations but now
15    at trial they, Mr. Gonzalez changed his story.  Though even he
16    seems somewhat uncertain about it.  He claimed that
17    Mr. Apolinario was paid ten dollars per hour for any hours
18    above 40 that he worked.
19              Plaintiff submits that that simply is not true and the
20    credible evidence is what Mr. Apolinario testified to and what
21    the defendants had admitted to in their answer.  But even if it
22    were to, even if the defendants has paid Mr. Apolinario ten
23    dollars her hour as a sort of overtime rate, they still would
24    have been in violation of the overtime laws.  During the time
25    that Mr. Apolinario's lawsuit covers, the minimum wage rate was
```

1    I think at the lowest point $7.15 per hour.  One and a half

2    times that -- can't do the math exactly -- is about 10.75 per

3    hour.  So even if the defendants are to be believed that

4    Mr. Apolinario was paid ten dollars per hour for overtime work,

5    that is not a permissible rate either.  So I think there can be

6    no serious dispute that Mr. Apolinario is entitled to overtime

7    wages in some amount.

8            Now apart from the factual dispute about the exact

9    amount he was paid and the hours that he worked, there's a

10   dispute over whether Luis Angie Deli is a restaurant as defined

11   by Section 146 Subpart 3.1 of the New York codes, rules and

12   regulations.  And the testimony from both Mr. Apolinario and

13   from Mr. Gonzalez establishes that Luis Angie Deli is a

14   restaurant under the definition of these regulations.  The

15   regulations provide that a restaurant is any eating or drinking

16   place that prepares and offers food for human consumption

17   either on its premises or by counter service to the public.

18   And the really can't be any dispute that Luis Angie Deli did

19   that.

20           Mr. Gonzalez admits they had a grill.  They had the

21   deli slicer.  They prepared sandwiches, prepared other foods,

22   meat, chicken, bacon.  This wasn't just heating up foods that

23   came in a box or something like that, something of that sort

24   but the workers at Luis Angie Deli actually prepared the food,

25   seasoned it, cooked it and so the Luis Angie Deli should fall

1    under the definition of a restaurant and therefore should be

2    covered by the hospitality wage order in Section 146 which as I

3    said in the opening, means that Mr. Apolinario when he was

4    being paid a flat weekly salary, the regular rate of pay is

5    determined by dividing that weekly salary by 40 hours a week,

6    not by the actual number of hours worked.  And then overtime

7    under any calculation is one and a half times that regular

8    rate.

9           In addition to the overtime claims plaintiff also

10   testified that he regularly worked a day with a spread of hours

11   of more than ten hours a day.  He would start at seven a.m.

12   finish at 11 p.m.  During part of his employment he had a break

13   but whether or not he had a break, the spread of hours Monday

14   through Friday was greater than ten and he was always paid the

15   same amount.  He did not receive additional pay for working a

16   spread of hours greater than ten for Monday through Friday.

17          He also has claims which he's established that the

18   defendants never gave him notice, a written notice of his

19   wages.  They never gave him a wage statement when he was paid

20   and I don't believe there's been any testimony to the contrary

21   from defendants on that issue.

22          Finally, the last claims of Mr. Apolinario are his

23   retaliation claims.  And that I would submit, really does come

24   down to a credibility contest.  Mr. Apolinario testified that

25   he was told by Mr. Gonzalez to withdraw the lawsuit and

F6UAAAPO4                    Summation - Hidalgo

1   threatened in many ways, possible deportation, possible child

2   support of police report, that is Mr. Gonzalez would make

3   claims for and ultimately that Mr. Apolinario was fired because

4   he refused to withdraw the lawsuit.

5          Mr. Gonzalez disputes that.  So I think this is just a

6   plain question here as to who the Court finds more credible.

7   But I think when the Court hooks at a whole the testimony given

8   by both sides in this case Mr. Apolinario has been more

9   credible on all the other issues, unlike Mr. Gonzalez who has

10  contradicted admissions in defendant's answer.  Mr. Apolinario

11  has been consistent.  And under the retaliation issue as with

12  the other issues in this case, we submit that the Court should

13  believe Mr. Apolinario and grant judgment for him of his

14  claims.  Thank you.

15         THE COURT:  Thank you.  Mr. Androphy .

16         Mr. Hidalgo.

17         MR. HIDALGO:  Yes, your Honor.

18         Your Honor, my clients did not maintain the proper

19  bookkeeping of their payroll records.  That is not in dispute.

20  What is in dispute is the wages and the overtime paid to the

21  defendant and the various other claims that the plaintiffs are

22  raising.

23         Your Honor, the plaintiff and the defendant both

24  testified as to the business, the potential size of the

25  business, the food products sold there.  It's predominantly a

F6UAAAPO4                    Summation - Hidalgo

1    grocery store known more commonly as "a bodega".  There are

2    various food products that are sold there.  So, food is

3    prepared.  There is an area where that food is prepared.  It's

4    limited in size and scope.  There isn't an oven.  Most of the

5    food my client testified is toasted.  Some of it is grilled.

6    But most of it is bread preparation of sandwiches which are

7    predominantly toasted.

8              We've provided pictures that show both what the store

9    looks like from the outside.  Most of the products sold at the

10   store are household goods that people in the neighborhood buy.

11   This is a part of the business where food is prepared and sold

12   but it is not a predominant nature of the business.

13             Now, the plaintiff alleges that he was not paid

14   overtime wages in accordance with state and federal laws.  The

15   plaintiff also alleges that the defendant retaliated against

16   him by firing him.  The plaintiff goes on in the complaint to

17   allege various forms of harassment including that the defendant

18   threatened him with immigration deportation, threatened him in

19   filing an alleged police report for theft and threatened him

20   with contacting child support services which I understand to be

21   for child support.

22             Now, the reason I raise this, your Honor, is that

23   these allegations that the plaintiff has claimed these

24   violations, these alleged violations that the plaintiff is

25   claiming he did not in any one of those incidents ever file a

F6UAAAPO4                    Summation - Hidalgo

1    complaint.

2           The plaintiff's own testimony on the witness stand

3    today was asked if he ever filed a complaint for any of those

4    matters.  Plaintiff testified that he tried to file from my

5    understanding a restraining order but that the plaintiff stated

6    that the court which I don't know if it was the court or the

7    police department informed him that there wasn't enough

8    evidence to bring a charge.

9           Now, I state this to your Honor as it goes to the

10   plaintiff's credibility.

11          The plaintiff's made numerous allegations regarding

12   wages, lack of overtime payments.  My client testified that

13   even after the plaintiff filed the complaint the plaintiff

14   remained working on the premises.  Plaintiff also testified

15   that my client took retaliatory actions, however, the plaintiff

16   remained working on the premises for quite some time after

17   filing the complaint.  My client testified that he never

18   interfered with that.  And the only conversations that he had

19   regarding this matter was several attempts to settle the

20   matter.

21          My client gave testimony disputing these allegations

22   regarding the harassment or that he was terminated.  My client

23   testified that if anything it was the plaintiff who was the

24   aggressor, that on several occasions prior to his last day of

25   employ he had harassed or had gotten into an altercation with

1   my client, that my client had called the police and that the

2   police did come to the premises and asked that the defendant

3   please leave the premises.  It's my understanding that that was

4   the last time the defendant was on the premises.

5          Now, the reason I'm stating this, your Honor, is that

6   these allegations that the plaintiff is making go to the root

7   of his credibility.  The plaintiff would have us believe that

8   he was not paid wages in accordance with law, that he was

9   subsequently harassed after filing the complaint of various

10  forms of retaliation.

11         However, when coming to the evidence of whether the

12  plaintiff as he alleges that my client harassed him and made

13  these statements or took several actions against him there was

14  no evidence that could support those claims and the plaintiff

15  never filed a claim and the one time that he did try the police

16  told him there was not sufficient evidence.

17         Now, my client never stated on the witness stand that

18  he harassed the plaintiffs but what my client did testify is

19  that he allowed the plaintiff to dutifully work and did offer a

20  settlement to the plaintiff to resolve the matter, not to

21  harass him but to seek settlement.

22         Your Honor, I cannot contest the fact that my client

23  did not maintain proper payroll records, but what I can contest

24  is that my client has testified and the defendant has testified

25  and that the Court weigh the credibility of the witnesses.  My

F6UAAAPO4                    Summation - Hidalgo

1    client allowed the plaintiff to remain working on the premises

2    and did not take retaliatory action when he filed the

3    complaint.  And only the time he did leave work or employ was

4    when the defendant became belligerent at which point my client

5    called the police.

6          We ask that the Court dismiss plaintiff's claims.

7    Thank you, your Honor.

8          THE COURT:  Thank you.  Mr. Hidalgo, let me ask you a

9    question.  And my question goes to your argument regarding the

10   2011 regulations.  Can you please explain to me your view of

11   the legal import of your argument that while the deli prepared

12   and sold food that that was not a predominant element of their

13   business.  What legal difference is there between a location

14   that prepares and serves food as a predominant portion of their

15   business as opposed to, I'll call it an ancillary part of their

16   business?

17         MR. HIDALGO:  Yes, your Honor.  Thank you for that

18   question.

19         Your Honor, we introduced into evidence pictures that

20   show the nature of the store both with its inventory that's

21   physically inside of the store and products that are visible

22   from the outside of the store.  With respect to the volume of

23   quantity of food that is sold, if it's prepared, my client has

24   testified that most of the food that is sold is food that is

25   either toasted as a sandwich or made in other types of forms of

F6UAAAPO4                    Summation - Hidalgo

1    sandwiches.

2              Now, with respect to the volume of the business and we

3    didn't entertain conversations regarding the volume of the food

4    that is sold at the business, while it is true that prepared

5    food is sold at the business, the amount of the volume of the

6    food that is sold and the nature of the food that is sold

7    should be taken into account.  Both witnesses, both the

8    plaintiff and the defendant testified with respect to the types

9    of foods that are prepared.

10             THE INTERPRETER:  Your Honor, I am sorry to interrupt

11   but I am getting signals from the plaintiff's table that the

12   equipment seems to have failed for Mr. Apolinario.  If I may

13   have a moment to substitute my headphones?

14             THE COURT:  Please, do.

15             THE INTERPRETER:  Thank you.

16             (Pause)

17             THE COURT:  Thank you.  Please, proceed Mr. Hidalgo.

18             MR. HIDALGO:  Yes, your Honor.

19             Your Honor, I was stating regarding the types of foods

20   that are prepared at the store that both witnesses had given

21   testimony regarding the type of food.  There is to my

22   understanding a single grill where a singular type of meat --

23   well, either chicken and meat but I heard mostly chicken is

24   grilled on the grill.  There is no other type of machinery that

25   prepares the food other than a toaster which toasts the food

F6UAAAPO4                        Summation - Hidalgo

1    and a microwave which reheats the food.

2              The only other machinery that prepares food is a deep

3    fryer which my client testified and both the defendant

4    testified that French fries are prepared.  My client testified

5    that the deep fryer was a small deep fryer, wasn't a large one.

6    And the reason I bring this up, your Honor, is that the Court

7    should take into consideration the nature of the business in

8    making a determination of whether the business is by law a

9    restaurant.  My client testified that several the features of

10   the restaurant were as if food is delivered which is a

11   predominantly traits of a restaurant.  If the restaurant or

12   food service delivers food, my client testified that at one

13   time years ago there was a limited amount of delivery.  I

14   believe my client said somewhere near five deliveries a day but

15   that none is functioning at that moment.  And that the few

16   products, food products -- I am sorry -- that are prepared are

17   very limited in nature.

18             Most of the food is deli food and limited nature of

19   sandwiches that are toasted.  There is no oven on the premise

20   to make any additional food product.  Most of the product or

21   part of the product are cold cuts which are already cooked

22   where the deli is preparing and toasting bread on the sandwich,

23   so that the actual preparation or the amount of work that goes

24   into preparing food is very limited.

25             The skills needed to prepare the food are not of the

F6UAAAPO4                    Summation - Hidalgo

1    nature of a cook.  They are of someone who would have a skill

2    in toasting bread and putting together perhaps certain

3    vegetables in a sandwich but nothing that would require a

4    license to prepare food at least in the nature of a restaurant.

5            So we ask that the Court take that into consideration

6    in making a determination of whether the bodega, the grocery

7    store is in fact a restaurant.

8            THE COURT:  Thank you.  Can you please expand on your

9    comment?  I am particularly interested in why you believe that

10   the distinctions that you are drawing have legal significance.

11   In other words, why does it matter, for example, if the food

12   was toasted?  Why does it matter if there is an oven?  Why does

13   it matter that the range of foods prepared were not expansive?

14   Why does it matter whether the person was a cook or the

15   restaurant was or was licensed in such a way?  How does that

16   key into the hospitality order which defines the term

17   restaurant industry to include "any eating or drinking place

18   that prepares or offers food or beverage for human consumption

19   either on any of its premises or by such service as catering,

20   banquet, box lunch or curb or counter service to the public...

21   How do the distinctions that you are drawing key into the

22   regulatory framework?  And I am particularly interested in

23   whether you have case law or other authority that should drive

24   me to consider the types of positions that you are asserting or

25   rather if I should be looking just to the text of the rule?

F6UAAAPO4                    Summation - Hidalgo

1          MR. HIDALGO:  Thank you, your Honor, for that

2    question.

3          With respect to the statute that your Honor has just

4    read regarding the definition of a restaurant and the language

5    does state for food that is consumed and I believe we were

6    saying on the premises.

7          THE COURT:  No.  No.  I am sorry.  I cannot accept

8    that mischaracterization of the statute.  It says:  Prepares or

9    offers food or beverage for human consumption either on any of

10   its premises or by such service as... counter service to the

11   public...

12         So it's either on any of its premises or... or by...

13   counter service.

14         MR. HIDALGO:  Yes, your Honor.  Thank you for that

15   clarification.

16         What I was stating was, your Honor, regarding the

17   statute is that the statutes I do note have case law that would

18   support the argument first of all.

19         Now, the reason we're asking that the Court look at

20   the statute with respect to the definition of the restaurant is

21   that although the store is preparing a degree of food on the

22   premises, the effort that is going into the preparation of the

23   food is not of the nature where the store is cooking a beef in

24   respect of an oven.  There is very limited amount of

25   preparation on the food itself.  And most of it that is done is

F6UAAAPO4                    Summation - Hidalgo

1    limited.  And also with respect to the amount of work or amount

2    of -- the scope of the food being prepared at the store

3    relative to the size of the store.  The store does sell a

4    degree of prepared food but it is not predominant product that

5    is sold at the business.  I apologize that I do not have case

6    law that would support that premise, your Honor, but that is

7    the position that defendants will take.

8              THE COURT:  Thank you.  I understand.

9              So this is what I'm going to do.  I would like to

10   consider the arguments and testimony that you've provided to me

11   today.  I may have additional questions of you.  Accordingly,

12   I'd like to take a recess now and reconvene at 2:30.  At that

13   time I will have the opportunity to ask you any follow-up

14   questions that I may have with respect to this matter and I'll

15   be able to provide you with a view as to how the case will

16   proceed going forward.

17             Let me thank you all for your work on this.  I will

18   reconvene after this one hour and ten-minute recess and I look

19   forward to seeing you all here at that time.

20             So thank you very much.  We are in recess.

21             (Recess)

22             (Continued on next page)

23

24

25

AFTERNOON SESSION

3:30 p.m.

THE COURT:  Thank you very much for your time and
testimony during the trial this morning.  I apologize for
taking more time than I anticipated during the recess.  I
wanted to spend some time evaluating the evidence and
considering the facts and the law applicable to this case.  I
am going to deliver my opinion now.

First, I'm going to say that the Court has subject
matter jurisdiction over the action as established in 29 U.S.C.
section 216(d), 20 U.S.C. 1337, 28 U.S.C. 1331.  The claims
arising under New York law are circulated state claims and they
inform parties in a case or controversy, and therefore within
the supplemental jurisdiction of the Court.

The testimony establishes that the defendants
constitute parties engaged in commerce or in the production of
goods and commerce within the meaning of the FLSA because the
employees handling and working goods and materials that have
been moved in and produced for commerce as illustrated by the
photographs and Luis Angie Deli has gross annual sales of
500,000 or more.

The testimony of Mr. Apolinario established that the
receipts of the business were between 1,000 and $2500 a day.
In the aggregate, I believe that the plaintiff has met its
burden of showing that the aggregate amount of the gross sales

1   of the business were $500,000 or more based on that testimony.

2           Plaintiff brings claims for:  (1) unpaid overtime

3   under the FLSA and New York Labor Law, (2) failure to provide

4   proper wage notices under the New York Labor Law, (3) failure

5   to provide proper wage statements under the New York Labor Law,

6   (4) unpaid spread of hours pay under the New York Labor Law,

7   and (5) violation of the antiretaliation provisions of the FLSA

8   and the New York Labor Law.  The plaintiff worked at Luis Angie

9   Deli Grocery from sometime in 2000 until July 13, 2014.

10          Liability.

11          The term "employer" "includes any person acting

12  directly or indirectly in the interest of an employer in

13  relation to an employee."  29 U.S.C. § 203(d).  The Supreme

14  Court "has instructed that the determination of whether an

15  employer-employee relationship exists for purposes of the FLSA

16  should be grounded in 'economic reality rather than technical

17  concepts'" Barfield v. New York City Health and Hospitals

18  Corporation, 537 F.3d 132, 141 (2d Cir. 2008)(quoting Goldberg

19  v. Whitaker House Coop, 366 U.S. 28,33 (1961).  "Courts use the

20  same test to determine joint employment under both the NYLL and

21  the FLSA.  Glatt v. Fox Searchlight Pictures, Inc., 293 F.R.D.

22  516, 526 (S.D.N.Y. 2013).

23          An entity may be considered an employer based on its

24  exercise of either "formal control" or "functional control."

25  Barfield, 537 F.3d at 141-143; Glatt, 293 F.R.D. at 525-526.

1    And, under certain circumstances, an individual within a

2    company may be held personally liable under the FLSA as an

3    employer.  See Inclan v. New York Hospitality Group, Inc., 12

4    CV 4498 (NRB), 2015 WL 1399599, at *13.  (S.D.N.Y. March 26,

5    2015).

6         "When it comes to employer status under the FLSA,

7    control is key."  Glatt 293 F.R.D. at 525 (internal quotation

8    marks omitted) (emphasis added).  The Second Circuit has

9    adopted a four-factor test to measure formal control:  "whether

10   the alleged employer (1) had the power to hire and fire the

11   employees, (2) supervised and controlled employee work

12   schedules are conditions of employment, (3) determined the

13   method of payment, and (4) maintained employment reports."

14   Carter v. Dutchess Community College, 735 F.2d 8, 12 (2d Cir.

15   1984 (internal quotation marks omitted).

16        The Second Circuit has "emphasized two particular

17   areas of inquiry for cases involving individual defendants

18   alleged to be FLSA employers."  Inclan, 2015 WL 1399599, at

19   *14.  The first inquiry concerns "the scope of an individual's

20   authority or operational control over a company," and the

21   second inquiry concerns "hypothetical versus actual power."

22   Irizarry v. Catsimatidis, 722 F.3d 99, 106 (2d Cir. 2015).

23        Under the first inquiry, "an individual defendant must

24   possess control over a company's actual operations in a manner

25   that relates to a plaintiff's employment."  Irizarry, 722 F.3d

1    at 109.  "Some degree of individual involvement in a company in

2    a manner that affects employment-related factors, such as

3    workplace conditions and operations, personnel or

4    compensation," is required for an individual to be considered

5    an employer.  Id.

6          Under the second inquiry, operational control "need

7    not be exercised constantly for an individual to be liable

8    under the FLSA."  Irizarry 722 F.3d at 110.  "[T]he

9    manifestation of or, at the least, a clear delineation of an

10   individual's power over employees is an important and telling

11   factor in the economic reality test."  But "ownership . . . is

12   insufficient to establish that an individual is an employer

13   without some involvement in the company's employment of the

14   employees."  Id at 111.

15         The testimony establishes that the defendant, Luis

16   Angie Deli, owns and operates a deli located at 976 Prospect

17   Avenue in the Bronx, known as Luis Angie Deli.  The deli is a

18   corner delicatessen and grocery that sells food, including

19   sandwiches, that are made in the deli.  Mr. Gonzalez owns and

20   operates the deli and has during all time relevant to this

21   action.  The deli, Luis Angie Deli, Inc., is a domestic

22   corporation, as I understand it, organized under the laws of

23   the State of New York.

24         Mr. Gonzalez determined at all times relevant to this

25   action the employees' pay, particularly that of Mr. Apolinario

1    at the deli.  Mr. Gonzalez determined at all times relevant to

2    the action employees' work schedules at the deli, including

3    that of Mr. Apolinario.  I understand that the deli is open 24

4    hours a day in accordance with the testimony of Mr. Apolinario.

5         At all times relevant to the action as established in

6    the testimony, Mr. Gonzalez was in charge of managing the deli,

7    and I understand that while Mr. Gonzalez was not charged with

8    hiring the individual defendant, he had the authority to hire

9    and fire employees at the deli.

10        Mr. Apolinario was hired to work at Luis Angie Deli in

11   approximately 2000, where he worked as a sandwich maker and

12   counter worker until July 13, 2014.  Mr. Gonzalez set Mr.

13   Apolinario's schedule, his rates, paid him, and had the

14   authority to hire and fire employees at the deli.

15        The testimony of the two witnesses in this trial

16   clearly established to me that both defendants, Luis Angie Deli

17   Grocery, Inc. and the individual defendant, Luis Obdulio

18   Gonzalez, were employers of plaintiff, Eulogio Apolinario,

19   under the FLSA and the New York Labor Law.

20        With respect to the New York Labor Law notice and

21   record keep requirements, I would like to say the following.

22   As of April 9, 2011, under New York law, employers are required

23   to maintain employment records and "contemporaneous, true, and

24   accurate" payroll records for at least 6 years.  See N.Y. Lab.

25   Law §§ 195-4, 661.  Prior to that date, employers were required

to keep such records for at least 3 years.  <u>See</u> N.Y. Lab. Law §

195-4 (versions through October 25, 2009, and from October 26,

2009 through April 8, 2011).

     Wage Notices.

     The New York Labor Law also requires employers to

provide a written notice to their employees upon hiring

containing information such as the employee's rate of pay, any

credits, such as the tip credit, and the employee's regular

payday, among other things.  <u>See</u> N.Y. Lab. Law § 195-1(a).

Although the specific requirements for the contents and timing

of this notice have changed multiple times over the last 6

years, the requirement of a written notice upon hiring has not.

<u>See</u> N.Y. Lab. Law § 195 (versions effective through October 25,

2009; from October 26, 2009, through April 8, 2011; and from

April 9, 2011 through December 28, 2014).

     Starting in 2011, the New York Labor Law began

requiring that employers (1) provide the written notice both in

English and in the employee's self-identified primary language,

(2) provide such notice "on or before February 1st of each

subsequent year of the employee's employment with the

employer," (3) obtain the employee's signature upon providing

them with the required notice, and (4) retain that signed

receipt for at least 6 years.  <u>See</u> N.Y. Lab. Law § 195-1(a)

(versions effective April 9, 2011 through December 28, 2014,

and current); <u>see also</u> New York Compilation of Codes, Rules and

1   Regulations, which I will refer to subsequently as "the New

2   York Regulations," Title 12 § 146-2.2 (effective 2011).

3            In 2011 the New York Labor Law was also amended to

4   provide a monetary penalty for an employer's failure to provide

5   the required notice.  "If any employee is not provided within

6   10 business days of his or her first day of employment a notice

7   as required by [N.Y. Lab. Law § 195-1], he or she may recover

8   in a civil action damages of $50 for each work week that the

9   violations occurred or continue to occur but not to exceed a

10  total of $2,500.  N.Y. Lab. Law § 198 (1-b) (effective April

11  92011, through February 26, 2015)

12           The plaintiff testified in this case that he never

13  received written notice of his pay rate or wages.  He testified

14  that he never signed any documents with respect to his pay rate

15  or wages.  Indeed, the defendants have acknowledged that they

16  have not maintained proper records.  Therefore, I conclude that

17  the defendants failed to provide the plaintiff with written

18  notice of his pay rate and wages as required by the New York

19  Labor Law.  Accordingly, plaintiff is entitled to the statutory

20  maximum of $2500 in damages.

21           Wage Statements.

22           In addition to written wage notices, employers must

23  provide a wage statement to each employee "with every payment

24  of wages."  See N.Y. Lab. Law § 195-3.  Prior to 2011 the New

25  York Labor Law required that this statement list "gross wages,

F6UAAAPO4                    Summation - Hidalgo

deductions and net wages, and upon the request of an employee
. . . an explanation of how such wages were computed."  See
N.Y. Lab. Law § 195-3 (versions effective through October 25,
2009, and from October 26, 2009, through April 8, 2011).

As of April 9, 2011, an employee's wage statement must
list "the dates of work covered by that payment of wages, name
of the employee, name of employer, address and phone number of
employer; rate or rates of pay, and basis thereof, whether paid
by the hour, day, week, salary, piece, commission, or other;
gross wages, deductions; allowances, if any, claimed as part of
the minimum wage; and net wages."  N.Y. Lab. Law § 195-3
(effective April 9, 2011).

For nonexempt employees, such as plaintiff here, the
notices must also include "the regular hourly rate or rates of
pay; the overtime rate or rates of pay; the number of regular
hours worked, and the number of overtime hours worked."  Id.
The updated law retains the requirement that "[u]pon the
request of an employee, an employer shall furnish an
explanation in writing of how such wages were computed."  Id.

In 2011 the New York Labor Law was also amended to
provide a monetary penalty for an employer's failure to provide
the required notice.  "If any employee is not provided a
statement or statements as required by [N.Y. Lab. Law § 195-3]
he or she shall recover in a civil action damages of $100 for
each work week that the violations occurred or continue to

1    occur but not to exceed a total of $2500."  N.Y. Lab. Law § 198

2    (1-d) (effective April 9, 2011, through February 26, 2015).

3         In this case the plaintiff testified that he never

4    received a wage statement when he was paid.  Again, the

5    defendants acknowledge that no such statements were provided.

6    Therefore, I conclude that the defendants failed to provide the

7    plaintiff with the wage statements required by N.Y. Lab. Law §

8    195(3).  Plaintiff is entitled to the statutory maximum of

9    $2,500 in damages with respect to this violation.

10        Overtime.

11        The FLSA embodies "a uniform national policy of

12   guaranteeing compensation for all work or employment engaged in

13   by employees covered by the act."  Tennessee Coal, Iron &

14   Railroad Co. v. Muscoda Local No. 123, 321 U.S. 590, 602

15   (1944).  The FLSA provides that any employee who works more

16   than 40 hours in a week is entitled to overtime pay for those

17   hours in excess of 40 at a rate "not less than 1 1/2 times the

18   regular rate at which he is employed."  29 U.S.C. § 207(a)(1).

19   The same is true under the regulations implementing the New

20   York law for hospitality workers, such as the plaintiff.  See

21   N.Y. Regulations Title 12 § 146-1.4.

22        The New York Labor Law "is the state analog to the

23   federal FLSA."  Thus, except for where they differ, as I will

24   outline shortly, "courts apply the same analysis for FLSA and

25   New York Labor Law overtime claims.  Alvarez v. Michael Anthony

1    George Construction Corp., 15 F.Supp.3d 285, 291 (E.D.N.Y. 2014

2    (internal citations and alterations omitted); see also Kuebel

3    v. Black & Decker Inc., 643 F.3d 352, 357, n.2, (2d Cir. 2011).

4             FLSA Recordkeeping Requirements.

5             Much like the New York Labor Law, the FLSA requires

6    employs to "make, keep, and preserve" records of their

7    employees "wages, hours, and other conditions and practices of

8    employment." 29 U.S.C. § 211(c); see also 29 C.F.R. §

9    516.2(a). Payroll records must be retained by employers for a

10   minimum of 3 years, and all other records must be retained for

11   a minimum of 2 years. See 29 C.F.R. § 516.5(a), 516.6.

12            These recordkeeping and retension requirements "are

13   not mere technicalities but substantive obligations that are

14   fundamental underpinnings of the FLSA and critical to ensuring

15   the statute's effectiveness." Amaya v. Superior Tile & Granite

16   Corp., 10 CV 2545 (PGG), 25 WL 130425 at *6 (S.D.N.Y. Jan. 17,

17   2012).

18            "An employer's duty under the FLSA to maintain

19   accurate records of its employees' hours is nondelegable."

20   Kuebel, 643 F.3d at 363. Thus, even where employees fill out

21   their own time cards, even if they do so inaccurately, because

22   the employer is responsible for keeping accurate records, the

23   employer is liable if those records are inaccurate. See Id.

24            The Supreme Court's Burden-Shifting Test.

25            An employee suing his employer for unpaid overtime

"has the burden of proving that he performed work for which he was not properly compensated."  Anderson v. Mt. Clemens Pottery Company, 328 U.S. 680, 687 (1946).  He must also prove "that the employer had actual or constructive knowledge of that work."  Kuebel, 643 F.3d at 361.

In cases like this, courts use a burden-shifting test held by the Supreme Court in Mt. Clemens.  328 U.S. at 687-88.  The test which recognizes that "it is the employer who has the duty under [the FLSA] to keep proper records of wages, hours, and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed."  Id.

Under this burden-shifting test, where an employer's records are inaccurate or inadequate, "an employee has carried out his burden if he proves that he has in fact performed the work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.

The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the Court may then award damages to the employee even though the result be only approximate."  Id at 687-688.

F6UAAAPO4                    Summation - Hidalgo

1          Defendants have acknowledged that they did not keep

2     records of the time that Mr. Apolinario worked.  No

3     contemporaneous records of the time that he worked are

4     available.  Similarly, the plaintiff testified that he was not

5     required to record his hours, and defendants never recorded his

6     hours.  Given the testimony in this case, it is apparent to me

7     that the defendants have failed to meet their burden.  They

8     have failed to come forward with evidence of the precise amount

9     of work performed or the evidence to negative the reasonable-

10    ness of the inference to be drawn from the employee's evidence.

11    Accordingly, I may award damages to the employee even though

12    the result be only approximate.

13          Determining Hours Worked.

14          An employee can meet his burden to prove that he

15    performed work for which he is not properly compensated

16    "through estimates based on his own recollection." Kuebel, 643

17    F.3d at 362.  Courts in this circuit find that an employee has

18    met her burden when she presents credible testimony that is

19    corroborated in some way, such as through the testimony of a

20    co-worker, see, e.g., Park v. Seoul Broad Systems Company, No.

21    05 Civ. 8956 (BSJ), 2008 WL 619034, at *7 (S.D.N.Y. March 6,

22    2008); Rivera v. Ndola Pharmacy Corp., 497 F.Supp.2d 381,388

23    (E.D.N.Y. 2007), or at least in part by the employer's records

24    or other evidence, see e.g. Doo Nam Yang v. ABCL Corp., 427

25    F.Supp.2d 327,334 (S.D.N.Y. 2005); Alvarez v. Michael Anthony

1   George Construction Corp., 15 F.Supp.3d 285, 291 n.2, and

2   292-93 (E.D.N.Y. 2014).

3            Based on the testimony of Mr. Apolinario at trial

4   today, I find that from March 2008 until July 2009 Mr.

5   Apolinario's regular work schedule was from 7:00 a.m. until

6   11:00 p.m. Monday through Friday, 3:00 p.m. to 11:00 p.m. on

7   Saturday, and from 1:00 p.m. to 10:00 p.m. on Sundays.  From

8   July 2009 until September 2013, Mr. Apolinario's regular work

9   schedule or hours I find was 7:00 a.m. to 11:00 a.m. and 3:00

10  p.m. to 11:00 p.m. Mondays through Fridays, from 3:00 p.m. to

11  11:00 p.m. on Saturdays, and 1:00 p.m. to 10:00 p.m. on

12  Sundays.

13           I further find that from September 2013 until the end

14  of his employment on July 13, 2014, Mr. Apolinario's work hours

15  or regular work schedule was from 7:00 a.m. to 11:00 a.m. and

16  from 2:00 p.m. to 11:00 p.m. Monday through Friday, from 3:00

17  p.m. to 11:00 p.m. on Saturdays, and 1:00 p.m. to 10:00 p.m. on

18  Sundays.

19           These were his regular hours.  Those schedules that I

20  just described I find to be his regular hours, but he sometimes

21  worked longer.

22           Mr. Gonzalez testified about a somewhat different

23  schedule in this case, but I fully credit the testimony of Mr.

24  Apolinario on this point.  Mr. Gonzalez acknowledged during his

25  testimony that his recollection was imprecise.  I do not find

F6UAAAPO4                    Summation - Hidalgo

1    Mr. Gonzalez' version of the events with respect to Mr.

2    Apolinario's schedule and hours worked credible in the face of

3    testimony of Mr. Apolinario and in the complete absence of any

4    documents that reflect the hours worked by the plaintiff in

5    this case.

6          Determining an Employee's Regular Rate and Applicable

7    Overtime Compensation.

8          Regular Rate Under the FLSA.

9          Under the FLSA, an employee's regular rate "refers to

10   the hourly rate actually paid to the employee for the normal,

11   nonovertime work for which he is employed." Walling v.

12   Youngerman-Reynolds Hardwood Company, 325 U.S. 419, 424 (1945)

13   see also 29 U.S.C. § 207(e).

14         "The regular rate, by it's very nature, must reflect

15   how payments which the parties have agreed will be received

16   regularly during the work week exclusive of overtime payments."

17   It is not an arbitrary label chosen by the parties; it is an

18   actual fact." Walling, 325 U.S. at 424.

19         Where employees are paid hourly, determining the

20   regular rate is generally straightforward.  But where employees

21   are paid a daily or weekly salary, as plaintiff claims was "in

22   order to evaluate an employer's FLSA compliance, wages must be

23   expressed in terms of a regular hourly rate." Adams v.

24   Department of Juvenile Justice, 143 F.3d 61,66 (2d Cir. 1998).

25         Under the FLSA, "there is a rebuttable presumption

F6UAAAPO4                    Summation - Hidalgo

1  that a weekly salary covers 40 hours.  The employer can rebut

2  the presumption by showing an employer-employee agreement that

3  the salary cover a different number of hours."  Giles v. City

4  of New York, 41 F.Supp.2d 308, 317 (S.D.N.Y. 1999) (emphasis

5  added).  But "unless the contracting parties intend and

6  understand the weekly salary to include overtime hours at the

7  premium rate, courts do not deem weekly salaries to include the

8  overtime premium for workers regularly logging overtime."  Id

9  (collecting cases).

10       I am to construe the FLSA overtime provision broadly,

11  and as Judge Motley said in Giles, "A finding that a salary

12  included overtime, in the absence of proof of an agreement so

13  stating, would be the sort of 'narrow, grudging' FLSA

14  application that the Supreme Court rejected soon after

15  enactment."  Id.  (Emphasis added) (quoting Tennessee Coal,

16  Iron & Railroad Company, et al., 321 U.S. at 597).

17       Such an agreement must be express or explicit.  See

18  e.g. Giles, 41 F.Supp. 17 at 317; Amaya v. Superior Tile &

19  Granite Corp., No. 10 CV 2545 (PGG), 12 WL 130425, at *9

20  (S.D.N.Y. Jan. 17, 2011).

21       "In the absence of any written instrument

22  memorializing the parties' intentions, the court must infer the

23  terms of their agreement from the entire course of their

24  conduct based on the testimonial and documentary evidence in

25  the record."  Moon v. Kwon, 248 F.Supp.2d 201,206 (S.D.N.Y.

F6UAAAPO4                    Summation - Hidalgo

1   2002).  And "even when wages exceed the minimum prescribed by

2   Congress, the parties to the contract must respect the

3   statutory policy requiring the employer to pay 1 1/2 times the

4   regular hourly rate for all hours actually worked in excess of

5   40."  Adams, 143 F.3d at 67-68 (quoting Walling v. Helmerich &

6   Payne, Inc., 323 U.S. 37, 42 (1944))

7            The plaintiff in this case testified that from March

8   2008 until July 2009 he was paid $875 a week, from August 2009

9   through July 2014 he was paid $715 a week.  He also testified

10  that his pay did not vary when he worked more than usual.  I

11  credit this testimony.  The defendants did not present concrete

12  evidence to refute it.

13           Moreover, the defendants expressly admitted to this

14  payment structure in their answer to the complaint.  I know

15  that the months pleaded in the complaint differed from the live

16  testimony of Mr. Apolinario; therefore, the defendants'

17  admission covers a slightly different period; the difference in

18  rate of pay difference by one month.

19           Still, I credit the live testimony with respect to the

20  payments made to Mr. Apolinario.  I believe that the plaintiff

21  understood that he would receive a fixed salary for the period

22  of time worked.  Accordingly, in order to determine his regular

23  rate of pay under the FLSA, I divide his weekly pay by the

24  number of hours that he worked in a week.

25           Thus, the plaintiff is entitled to $20,952.08 in

1    damages for unpaid overtime under the FLSA.  However, the New

2    York Labor Law provides for damages during the same period.

3    Therefore, I will be awarding the plaintiff the larger amount

4    that is due under the New York Labor Law.

5            Regular Rate Under the New York Labor Law

6    Restaurant/Hospitality Industry.

7            This case was filed in 2014, thus the statute of

8    limitations under the New York Labor Law extends to 2008.  For

9    the years 2008 through 2010, restaurants and their employees

10   were governed by the restaurant industry minimum wage order

11   which defined "restaurant industry" as follows.

12            "(a)  The term 'restaurant industry' includes any

13   eating or drinking place that prepares and offers food or

14   beverage for human consumption either on any of its premises or

15   by such service as catering, banquet, box lunch, curb service

16   or counter service to the public, to employees, or to members

17   or guests of members, and services in connection therewith are

18   incidental thereto.

19            "(b)  The industry includes but is not limited to

20   restaurant operations of other types of establishments,

21   restaurant concessions in any establishment, and concessions in

22   restaurants.

23            "(c)  The term 'restaurant industry' excludes:

24            "(1)  Eating or drinking places operated by

25   establishments customarily offering lodging accommodations of 5

or more rooms to the public, to employees or to members or

guests of members, except that it does not exclude eating or

drinking places offering lodging accommodation only to their

own employees;

        "(2)  Eating and drinking places operated by

establishments where the service of food or beverage is not

available to the public but is incidental to instruction,

medical care, religious observance, or the care of handicapped

or destitute persons or other charges; and

        "(3)  Eating and drinking places operated by any

corporation, unincorporated association, community chest, fund

or foundation organized exclusively for religious, charitable,

or educational purposes, no part of the net earnings of which

inures to the benefit of any private shareholder or individual.

    "These inclusions shall not be deemed to exempt such

establishments from coverage under another minimum wage order

which covers them."

    New York Regulations, Title 12 § 137-3.1.

    During this period the calculation of a restaurant

employee's regular rate was governed by New York Regulations

Title 12 § 137-35, which provides:

    "The term 'regular rate' shall mean the amount that

the employee is regularly paid for each hour of work.  When an

employee is paid on a piece rate, salary, or other basis than

the hourly rate, the regular hourly rate shall be determined by

1  dividing the total hours worked during the week into the

2  employee's total earnings."

3          When the New York Department of Labor proposed

4  changing these regulations to their current form, it issued the

5  following regulatory impact statement.

6          "Existing relations [prior to 2011] do not prohibit

7  paying salaries to nonexempt workers per se, although they do

8  require that the salary cover at least the minimum hourly rate

9  for all hours worked, and they do require extra pay in addition

10  to the salary, at a half time of the regular hourly rate, for

11  any overtime hours.

12          "Currently, when nonexempt workers are paid a salary

13  for all hours worked, the 'regular rate' must be derived by

14  dividing the salary by the total number of hours worked during

15  that pay period.  For hours worked in excess of 40 per week,

16  the employee must be paid time plus one half the regular rate.

17          "This requirement, well established in case law, is

18  not well known, and multitudes of overtime violations result

19  from payment of weekly rates.  Under the current regulations,

20  which technically allow nonexempt workers to be paid by salary,

21  even a well-meaning employer can easily end up violating both

22  the minimum wage/overtime and recordkeeping requirements of

23  Article 19 and its current attendant regulations.

24          "To remedy these problems, the proposed regulations

25  require that (i) all nonexempt employees (except commissioned

1    salespeople) be paid an hourly rate; (ii) at the time of hiring

2    and at any time prior to a change in the wage rates, employers

3    must give employees written notices of their regular and

4    overtime hourly rates; and (iii) employers are specifically

5    prohibited from paying employees (except commissioned

6    salespersons) on any basis other than an hourly rate, and

7    failure to do so shall result in the commissioner's calculation

8    of an hourly rate by dividing the employee's total weekly

9    earnings, not including exclusions, but a lesser of 40 hours or

10   the actual number of hours worked by that employee during that

11   work week, with a determination of regular and overtime wages

12   due to be based upon such calculated hourly rate."  New York

13   Register, pp. 21-22 (October 20, 2010).

14        "These new regulations apply to workers in the

15   hospitality industry, which is defined as any restaurant or

16   hotel; the term "restaurant" is defined as:

17        "(b)  The term 'restaurant' includes any eating or

18   drinking place that prepares and offers food or beverage for

19   human consumption either on any of its premises or by such

20   service as catering, banquet, box lunch, curb service, or

21   counter service to the public, to employees or to members or

22   guests of members, and services in connection therewith or

23   incidental thereto.  The term "restaurant" includes but is not

24   limited to restaurant operations of other types of

25   establishments, restaurant concessions, and any establishment

F6UAAAPO4                    Summation – Hidalgo

1    in concessions in restaurants."

2              THE INTERPRETER:  Your Honor, I have to let you know I

3    need a break.  If you think it is significant for me to

4    continue interpreting, then I would need a break at this point.

5              THE COURT:  Let me close the quote.  New York

6    Regulations Title 12 § 146-3.1.

7              Let me pause at this point and ask, parties, do you

8    wish to continue with the translation?

9              MR. ANDROPHY:  I think Mr. Apolinario's stopped

10   working some time ago, so we are happy to go on without it.

11             MR. HIDALGO:  We can go without the translations.

12             THE INTERPRETER:  Thank you very much.

13             THE COURT:  Thank you.  I'm going to proceed.

14             The citation that I just read is to New York

15   Regulations Title 12 § 146-3.1.

16             "The hospitality industry excludes:

17             "(1) establishments where the service of food or

18   beverage or the provision of lodging is not available to the

19   public or to members or guests of members but is incidental to

20   instruction, medical care, religious observation, or the care

21   of persons with disabilities or those who are impoverished or

22   other public charges; and

23             "(2) establishments where the service of food or

24   beverage or the provision of lodging is offered by any

25   corporation, unincorporated association, community chest, fund

1    or foundation organized exclusively for religious, charitable,

2    or educational purposes, no part of the net earnings of which

3    inures to the benefit of any private shareholder or

4    individual."  New York Regulations Title 12 § 146-3.1(d).

5           Thus, the New York labor regulations for restaurant

6    workers that went into effect on January 1, 2011, required that

7    employees be paid hourly:  "employers may not pay employees on

8    a daily, weekly, salary, piece rate or other nonhourly rate

9    basis."  New York Regulations title 12 § 146-2.5.  The

10   regulations then provide that:

11          "If an employer fails to pay an employee an hourly

12   rate of pay, the employee's regular hourly rate of pay shall be

13   calculated by dividing the employee's total weekly earnings

14   not, including exclusions, from the regular rate by the lesser

15   of 40 hours or the actual number of hours worked by that

16   employee during the work week."  New York Regulations Title 12

17   § 146-3.5.

18          This calculation of the "regular rate" is then used to

19   determine an employee's applicable overtime rate of "1 1/2

20   times the employee's regular rate for hours worked in excess of

21   40 hours in one work week."  New York Regulations Title 12 §

22   146-1.4.

23          In this instance the plaintiff has testified and I

24   have found that from March 2008 through July 2009 he was paid

25   $875 a week, from August 2009 through July 2014 he was paid

1    $715 a week.  I have further found that his pay did not vary

2    when he worked more than usual, as supported by his testimony.

3            I find that the deli where the plaintiff worked was

4    covered by the restaurant industry minimum wage order during

5    the period from 2008 through the effectiveness of the

6    hospitality wage order in 2011, and that his pay was governed

7    by the hospitality wage order from its effectiveness through

8    the date of his termination.

9            The testimony at trial clearly established that the

10   deli prepared and offered food and beverage for human

11   consumption either on any of its premises or by counter

12   service.  The deli was called a deli.  It prepared sandwiches.

13   It grilled steak and chicken.  It prepared French fries and

14   other foods.  I do not believe that the distinctions that the

15   defendants sought to introduce here were meaningful.

16           The deli prepared and served food for human

17   consumption.  I note that the regulations specifically provide

18   for restaurant operations of other types of establishments.  In

19   any event, that work was the focus of the plaintiff's

20   responsibilities at the deli.

21           Accordingly, for the period prior to the effectiveness

22   of the hospitality wage order, in order determine the

23   plaintiff's regular rate of pay, I divide his weekly pay by the

24   number of hours that he worked in a week.  After the

25   effectiveness of the new regulations in 2011, however, I divide

his weekly salary by 40 to arrive at his regular rate of pay.

Thus, applying those calculations, the plaintiff is entitled to

$218,938.20 in damages for unpaid overtime under the New York

Labor Law.

    Spread of Hours.

    In New York an employee is entitled to an extra hour's

pay at the base minimum wage rate on each day he works for

which "the spread of hours exceeds 10." See New York

Regulations Title 12 § 146-1.6 for restaurant workers (and

§ 137-1.7 for years prior to 2011); and § 142-2.4 for

miscellaneous workers.  "The spread of hours is the length of

the interval between the beginning and end of an employee's

workday" and "includes working time plus time off for meals

plus intervals off duty."  New York Regulations Title 12 §

146-1.6.

    For the years 2008 through 2011, a restaurant employee

was entitled to an extra hour's pay at the basic minimum hourly

rate "in addition to the minimum wages otherwise required" on

each day he worked for which the spread of hours exceeded 10

hours.  Shahriar v. Smith & Wollensky Restaurant Group, Inc.,

659 F.3d 234, 241-42, (2d Cir. 2011)  (quoting New York

Regulations Title 12 § 137-1.7).

    Courts in this circuit have adopted the New York

Department of Labor's position that the plain language of the

pre-2011 spread of hours provision indicates that it does not

F6UAAAPO4                        Summation – Hidalgo

1    apply to workers whose compensation is already sufficiently

2    above the minimum wage rate.   See, e.g., Martinez v. Hilton

3    Hotels Corp., 930 F.Supp.2d 508, 531 (S.D.N.Y. 2013); Flores v.

4    Anjost Corp. 284 F.R.D. 112,118-19 (S.D.N.Y. 2012); Zubair v.

5    Entech Engineering P.C., 808 F.Supp.2d 592, 601 (S.D.N.Y.

6    2011).

7               (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F6UAAAPO6                     Decision

In pre-2011 private party opinion letters, the Department of
Labor stated that the determination of whether spread of hours
pay is due is made on a daily basis, rather than on a weekly
basis.  See N.Y.S. Dep't of Labor Opinion Letter dated Mar. 16,
2007, file no. RO-07-0009, at 2, available at
https://labor.ny.gov/legal/counsel/pdf/Minimum%20Wage%20Orders/
RO-07-0009A.pdf.  Because overtime pay, on the other hand, is
calculated weekly, the DOL said that an employer is relieved of
the obligation to pay additional spread of hours pay only when
an employee's regular wage on a given day is greater than the
required spread of hours amount, before accounting for overtime
pay attributable to that day.  Id.

          As of January 1, 2011, restaurant employees are
entitled to such supplemental wages "regardless of a given
employee's regular rate of pay."  N.Y. Regulations, title 12,
section 146-1.6.  Therefore, even a restaurant employee who is
paid substantially more than the minimum wage is entitled to
spread of hours compensation, where applicable, for workdays
occurring after January 1, 2011.  See Martinez, 930 F. Supp. 2d
at 531-32 (citing N.Y. Regulations, title 12, section 146-1.6).
Plaintiff testified here that he was not paid spread of hours
pay.  I credit that testimony.  He is, therefore, entitled to
the payment of spread of hours pay.  For the period he worked
prior to 2011, I find that his daily pay was more than the
minimum wage he was owed for the hours he worked plus an extra

 1    hour for his spread of hours, thus he is not entitled to spread

 2    of hours pay for that time period.  He is entitled however to

 3    spread of hours pay.

 4            Therefore, plaintiff is entitled to $6,670 in damages

 5    for unpaid spread of hours pay under the NYLL.

 6                              RETALIATION

 7            The anti-retaliation provision of the FLSA makes it

 8    unlawful:

 9            to discharge or in any other manner discriminate

10    against any employee because such employee has filed any

11    complaint or instituted or caused to be instituted any

12    proceeding under or related to this chapter, or has testified

13    or is about to testify in any such proceeding, or has served or

14    is about to serve on an industry committee.

15            29 U.S.C.A. § 215(a)(3)

16            The anti-retaliation provision of the NYLL provides:

17            No employer or his or her agent, or the officer or

18    agent of any corporation, partnership, or limited liability

19    company, or any other person, shall discharge, threaten,

20    penalize, or in any other manner discriminate or retaliate

21    against any employee (i) because such employee has made a

22    complaint to his or her employer, or to the commissioner or his

23    or her authorized representative, or to the attorney general or

24    any other person, that the employer has engaged in conduct that

25    the employee, reasonably and in good faith, believes violates

1   any provision of this chapter, or any order issued by the

2   commissioner (ii) because such employer or person believes that

3   such employee has made a complaint to his or her employer, or

4   to the commissioner or his or her authorized representative, or

5   to the attorney general, or to any other person that the

6   employer has violated any provision of this chapter, or any

7   order issued by the commissioner (iii) because such employee

8   has caused to be instituted or is about to institute a

9   proceeding under or related to this chapter, or (iv) because

10  such employee has provided information to the commissioner or

11  his or her authorized representative or the attorney general,

12  or (v) because such employee has testified or is about to

13  testify in an investigation or proceeding under this chapter,

14  or (vi) because such employee has otherwise exercised rights

15  protected under this chapter, or (vii) because the employer has

16  received an adverse determination from the commissioner

17  involving the employee.

18          N.Y. Lab. Law § 215(1-a)

19          I'd like to go back briefly to my ruling with respect

20  to application of the restaurant industry wage, minimum wage

21  order and the hospitality order.  I intended to note and I did

22  not that none of the exclusions described in either of those

23  orders applies in this case.  No facts were demonstrated at the

24  trial that I believe established that any exclusion from the

25  definitions of restaurant industry or hospitality industry

F6UAAAPO6                        Decision

1     applied in those cases.

2              Back to the issue of retaliation.

3              Mr. Apolinario testified that the defendants

4     retaliated against him after he filed this lawsuit by, among

5     other things, threatening to report to the police that he stole

6     from them, threatening to report him to immigration and

7     eventually firing him on July 13, 2014.  ( 30-33)  On the other

8     hand, the defendants assert that Mr. Apolinario was not

9     terminated, but, rather that he quit.  This is a difficult

10    issue for me to assess.  As Mr. Androphy pointed out during

11    closing arguments, my conclusions here turn on a credibility

12    assessment of the witnesses.  Having viewed their testimony and

13    considering their demeanor, I conclude that Mr. Apolinario has

14    not met his burden of showing that he was fired in retaliation

15    for this suit.  I should be clear.  I am not concluding that

16    his version of facts is incorrect.  Rather, in this situation,

17    I believe that the evidence before me on this point is evenly

18    balanced.  Where the evidence is evenly balanced, the plaintiff

19    who bears the burden of proof has not met his burden of proof.

20    I'm not concluding that the testimony is inaccurate.  Rather,

21    I'm concluding that the plaintiff has not met his burden of

22    proof.  I cannot conclude, therefore that the plaintiff

23    prevails with respect to this claim.

24              WILLFULNESS

25              Statutes of Limitations

F6UAAAPO6                     Decision

1          The statute of limitations under the FLSA is two

2     years, except in the case of willful violations, for which the

3     statute of limitations is three years.  29 U.S.C. § 255(a).

4     Willfulness in this context means "voluntary, deliberate, [or]

5     intentional," as opposed to merely negligent.  McLaughlin v.

6     Richland Shoe Co., 486 U.S. 128, 133 (1988).  An employer

7     commits a willful violation of the FLSA if the employer "either

8     knew or showed reckless disregard for the matter of whether its

9     conduct was prohibited by [the FLSA]."  Young v. Cooper Cameron

10    Corp., 586 F.3d 201, 207 (2d Cir. 2009) (quoting McLaughlin,

11    486 U.S. at 133).  The burden is on the plaintiffs to show the

12    defendants' actions were willful.  Id.

13         The NYLL statute of limitations is six years,

14    regardless of whether a violation is deemed willful.  See N.Y.

15    Lab. Law § 663.

16         I do not believe that the plaintiff has met its burden

17    of showing that Mr. Gonzalez's behavior met the standard for

18    willfulness required in this context.  I have no testimony or

19    evidence that he was aware of his obligations or that he had

20    any information that his approach to paying Mr. Apolinario was

21    in violation of the law prior to the initiation of this

22    litigation.  As a result, I do not find that his actions were

23    willful for these purposes.  I believe that he was ignorant of

24    the law and I find that he was negligent.

25         Therefore, I will calculate plaintiff's damages under

the FLSA using a two-year statute of limitations, starting in

April 3, 2012.

Liquidated Damages

Employees are also entitled to liquidated damages

under the FLSA in an amount equal to their unpaid wages, unless

"the employer shows to the satisfaction of the court that [his]

act or omission . . . was in good faith and that he had

reasonable grounds for believing that his act or omission was

not a violation of the Fair Labor Standards Act."  29 U.S.C §

260; see also 29 U.S.C § 216(b).  Liquidated damages under the

FLSA are not imposed as a penalty, but as "compensation to the

employee occasioned by the delay in receiving wages due caused

by the employer's violation of the FLSA."  McLean v. Garage

Mgmt. Corp., No. 10-CV-3950 (DLC), 2012 WL 1358739, at *5

(S.D.N.Y. April 19, 2012) (quoting Herman v. RSR Sec. Servs.

Ltd., 172 F.3d 132, 142 (2d Cir. 1999)); see also Overnight

Motor Transportation Co. v. Missel, 316 U.S. 572, 583 (1942).

Defendants may only avoid liquidated damages under the FLSA if

they demonstrate that they "acted in subjective good faith with

objectively reasonable grounds for believing that [their] acts

or omissions did not violate the FLSA."  Barfield v. New York

City Health and Hospitals Corp., 537 F.3d 132, 150 (2d Cir.

2008); see also 29 U.S.C. § 260.  Defendants' burden in this

regard is high:  "to establish the requisite subjective good

faith, an employer must show that it took active steps to

1    ascertain the dictates of the FLSA and then act[ed] to comply

2    with them."  McLean, 2012 WL 1358739, at *5 (quoting Barfield,

3    537 F.3d at 150).  In cases such as this one, "double damages

4    [are] the norm and single damages the exception."  Herman, 172

5    F.3d at 142 (citing Reich v. Southern New England

6    Telecommunications Corp., 121 F.3d 58, 71 (2d Cir. 1997)).

7    Employees may also recover liquidated damages under the NYLL.

8    Prior to a November 24, 2009 amendment to the NYLL, employees

9    could recover as liquidated damages "25% of unpaid wages if

10   [they] could prove that employers' NYLL violations were

11   'willful.'"  McLean, 2012 WL 1358739, at *8 (citing Kuebel v.

12   Black & Decker Inc., 643 F.3d 352, 366 (2d Cir. 2011)).  The

13   NYLL standard for willfulness "do[es] not differ to any

14   appreciable extent" from the standard for willfulness in FLSA

15   cases.  Id. at *7 (citing Kuebel, 643 F.3d at 366).  The

16   current law, as amended in 2009, shifts the burden to the

17   employer:  Employees are entitled to liquidated damages under

18   the NYLL "unless the employer proves a good faith basis to

19   believe that its underpayment of wages was in compliance with

20   the law."  N.Y. Lab. Law § 198(1-a).

21        While liquidated damages under the FLSA are

22   compensatory, liquidated damages under the NYLL "constitute a

23   penalty to deter an employer's willful withholding of wages

24   due."  Reilly v. Natwest Markets Grp. Inc., 181 F.3d 253, 265

25   (2d Cir. 1999) (quoting Carter v. Frito-Lay, Inc., 425 N.Y.S.2d

F6UAAAPO6                    Decision

115, 116 (1st Dep't 1980), aff'd., 438 N.Y.S.2d 80 (1981)).

Because each statute's liquidated damages provision serves a

different purpose, "plaintiff[s] may recover under both

statutes without obtaining an impermissible double recovery."

Lanzetta v. Florio's Enterprises, Inc., No. 08-cv-6181 (DC),

2011 WL 3209521, at *5 (S.D.N.Y. July 27, 2011) (analogizing to

discrimination cases, where plantiffs may seek different types

of damages under multiple statutes to obtain the greatest

possible relief); see also Tackie v. Keff Enterprises LLC, No.

14-cv-2074 (JPO), 2014 WL 4626229, at *5 (S.D.N.Y. Sept. 16,

2014) (noting that allowing recovery under both statutes is the

majority approach in the Second Circuit); Yu Y. Ho v. Sim

Enterprises, Inc., No. 11-cv-2855 (PKC), 2014 WL 1998237 at

*18-19 (S.D.N.Y. May 14, 2014) (noting double recovery is the

majority approach in the Second Circuit and collecting cases).

Defendants have not presented any evidence that would lead me

to conclude that they acted in subjective good faith with

objectively reasonable grounds for believing that [their] acts

or omissions did not violate the FLSA.   Nor have the

defendants proven a good faith basis to believe that their

underpayment of wages was in compliance with the law.

Therefore, the defendants have not met their burden, and

plaintiff is entitled to liquidated damages under both the FLSA

and the NYLL.

          Therefore, the plaintiff is entitled to:

1       $174,683.44 in liquidated damages for unpaid overtime

2  under the NYLL;

3       $20,952.08 in liquidated damages for unpaid overtime

4  under the FLSA; and

5       $6,162.50 in liquidated damages for unpaid spread of

6  hours pay under the NYLL.

7            OTHER AWARDS

8            Pre-Judgment Interest

9            As I just described, the liquidated damages provisions

10  of the FLSA and NYLL serve different purposes:  Such damages

11  are compensatory under the FLSA and punitive under the NYLL,

12  hence plaintiffs may recover both.  Under New York law,

13  pre-judgment interest-like an FLSA liquidated damages award-is

14  compensatory.  See J. D'Addario & Co. v. Embassy Indus., Inc.,

15  20 N.Y.3d 113, 117 (2012) ("The principle behind prejudgment

16  interest is that the breaching party should compensate the

17  wronged party for the loss of use of the money.").  Thus,

18  plaintiffs cannot recover pre-judgment interest in addition to

19  FLSA liquidated damages.  See Brooklyn Savings Bank v. O'Neil,

20  324 U.S. 697, 715 (1945) ("To allow an employee to recover the

21  basic statutory wage and liquidated damages, with interest,

22  would have the effect of giving an employee double compensation

23  for damages arising from delay in the payment of the basic

24  minimum wages.")

25            However, because NYLL liquidated damages are punitive

1  in nature, rather than compensatory, pre-judgment interest on

2  an NYLL wages or liquidated damages award is not duplicative

3  where there is no corresponding FLSA liquidated damages award.

4  See Tackie v. Keff Enterprises LLC, 14-cv-2074 (JPO), 2014 WL

5  4626229, at *5 (S.D.N.Y. Sept. 16, 2014).  Thus, plaintiffs may

6  recover pre-judgment interest for damages awarded under the

7  NYLL which are outside the FLSA statute of limitations, and for

8  damages awarded under the NYLL only (i.e., spread of hours

9  pay).  See McLean v. Garage Mgmt. Corp., 10-cv-3950 (DLC), 2012

10  WL 1358739, at *11 (S.D.N.Y. Apr. 19, 2012).

11          In wage and hour cases, courts generally compute

12  interest from a "median date between the earliest ascertainable

13  date the cause of action existed and the date the action was

14  filed or last date the cause of action existed."  Yuquilema v.

15  Manhattan's Hero Corp., 13-cv-461 (WHP) (JLC), 2014 WL 4207106,

16  at *12 (S.D.N.Y. Aug. 20, 2014) (quoting Gunawan v. Sake Sushi

17  Rest., 897 F. Supp. 2d 76, 93 (E.D.N.Y. 2012) (collecting

18  cases)).

19          Thus, interest on plaintiff's unpaid wages shall be

20  computed from April 3, 2010, the approximate midpoint of the

21  period between April 3, 2008 and April 3, 2012, which is the

22  time during which plaintiff's claims are subject only to the

23  NYLL because they fall outside the FLSA statute of limitations.

24  Interest on spread of hours pay shall be computed from October

25  7, 2012, the approximate midpoint of the period between January

F6UAAAPO6                     Decision

1, 2011 and July 13, 2014, the time period for which plaintiff

is owed spread of hours pay.  I will direct the Clerk of Court

to compute interest from these dates, and to include the

computed interest amount with the total damages amount.  See

N.Y. C.P.L.R. § 5001(c).

               Costs and Attorney's Fees

          Both the FLSA and NYLL allow prevailing plaintiffs to

recover costs and reasonable attorney's fees.  See 29 U.S.C. §

216(b); N.Y. Lab. Law § 663(1).  Plaintiff therefore may

recover both costs and reasonable attorney's fees.

          For the foregoing reasons, judgment will be entered in

favor of the plaintiff against both defendants, jointly and

severally, in the total amount of $432,406.22 plus interest,

which will be calculated by the Clerk of Court, and costs and

attorney's fees in an amount to be determined later.

          Mr. Androphy, when can you submit you application for

attorney's fees and costs?

          MR. ANDROPHY:  Could I have until next Friday,

July 10, I believe.

          THE COURT:  Thank you.

          Mr. Hidalgo, how much time would you like to oppose

the plaintiff's application for attorney's fees and costs?

          MR. HIDALGO:  Perhaps a week, your Honor, after I

receive it.

          THE COURT:  Thank you.

F6UAAAPO6                     Decision

1          Accordingly, plaintiffs shall submit your application

2     for attorney's fees and costs no later than July 10.  The

3     defendants' opposition, if any, to the application for fees and

4     costs will be due one week following service of the

5     application.

6          I will issue a written judgment that sets forth the

7     amount of the award in favor of the plaintiff in this matter.

8     My findings of fact and conclusions of law have just been read

9     by me in great detail into the record.  And with that, judgment

10    will be entered into favor of the plaintiff.

11         Are there any further applications before I adjourn

12    this trial?

13         Mr. Androphy.

14         MR. ANDROPHY:  Thank you, your Honor.  Just one

15    matter.  We ask that the judgment provide pursuant to New York

16    Labor Law Section 198 (4) that if the judgment remains unpaid

17    after 90 days of the entry of the judgment or expiration of the

18    time to appeal that the judgment or at least the New York Labor

19    Law portion of the judgment be increased by 15 percent?

20         THE COURT:  Thank you.  Do I need to provide for that

21    in the order or does that arise by application of law?

22         MR. ANDROPHY:  I think it's supposed to arise

23    automatically.  I don't know if the judgment will reflect that

24    if it's not reflected in your Honor's order.

25         THE COURT:  Thank you.  What I will do is review the

F6UAAAPO6                          Decision

1    statute.  I will also cull out in the order which components of

2    the aggregate amount awarded reflects damages awarded under the

3    FLSA.

4              MR. ANDROPHY:  Thank you, your Honor.

5              THE COURT:  Thank you.

6              Mr. Hidalgo?

7              MR. HIDALGO:  Nothing further, your Honor.

8              THE COURT:  Good.  Thank you very much.

9              Thank you counsel for your work on this matter.

10             Thank you, Mr. Apolinario.

11             Thank you, Mr. Gonzalez, for your testimony here

12   today.

13             This matter is adjourned.

14                            (Adjourned)

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

EULOGIO APOLINARIO

Direct By Mr. Androphy . . . . . . . . . . . .11

Cross By Mr. Hidalgo . . . . . . . . . . . . .23

Redirect By Mr. Androphy . . . . . . . . . . .32

LUIS OBDULIO GONZALEZ

Direct By Mr. Hidalgo . . . . . . . . . . . .34

Cross By Mr. Androphy . . . . . . . . . . . .55

                    DEFENDANT EXHIBITS

Exhibit No.                                  Received

1   . . . . . . . . . . . . . . . . . . . .47

2   . . . . . . . . . . . . . . . . . . . .48

3   . . . . . . . . . . . . . . . . . . . .49

4   . . . . . . . . . . . . . . . . . . . .50

5   . . . . . . . . . . . . . . . . . . . .51

6   . . . . . . . . . . . . . . . . . . . .52

7   . . . . . . . . . . . . . . . . . . . .52